## UNITED STATES v. BANISTER REALTY CO. et al.

### (Circuit Court, E. D. New York. May 9, 1907.)

1. NAVIGABLE WATERS—NAVIGABLE WATERS OF THE UNITED STATES DEFINED.
   The term "navigable waters of the United States" applies: First, to all waters capable of sustaining or being used for interstate or foreign commerce, covering every part of any body of water, tidal or otherwise, any portion of which is capable of such use; and, second, to all waters under the admiralty and maritime jurisdiction of the United States and over which the District Court of the United States can exercise its peculiar admiralty jurisdiction.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 5–11.]

2. SAME—POWER OF CONGRESS OVER—CONSTITUTIONAL GRANT.
   The power of Congress to legislate with respect to the navigable waters of the United States does not rest alone upon the constitutional provision giving it power to regulate interstate commerce, nor alone upon the provision extending the judicial power of the United States to all cases of admiralty or maritime jurisdiction, which vests Congress with power to legislate on all matters necessary to carry into execution such judicial power, but may be sustained under either or both provisions, and the various acts relating to obstructions to navigation are within such power where such navigation comes within the provisions of interstate or foreign commerce, or within the admiralty and maritime jurisdiction.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, § 2.]

**3. SAME—SUIT TO ENJOIN OBSTRUCTION—PRELIMINARY INJUNCTION.**

A preliminary injunction granted pending final hearing of a suit by the United States for a permanent injunction against the closing of the inlet connecting the Bay of Far Rockaway, on the southern coast of Long Island, with the ocean; the principal question at issue being as to whether or not such bay is at the present time navigable water within the jurisdiction of the United States, and it appearing that it has been such navigable water, until recently at least, and that the obstruction, if made, would have a tendency to change its character as such, by preventing the ebb and flow of the tide therein.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 61–65, 135–143.

Obstructions to navigation, jurisdiction of federal courts, see note to Bailey v. Mosher, 11 C. C. A. 318.]

In Equity. On motion for preliminary injunction.

William J. Youngs, U. S. Atty.

Hirsh & Rasquin, for defendants.

CHATFIELD, District Judge. Far Rockaway Bay is an ever-varying salt water and tidal indentation in the southern coast line of Long Island. Upon the latest United States government charts it is called the "Bay of Far Rockaway," separated from the Atlantic Ocean proper by a strip of land, designated "Far Rockaway Beach," and connecting with the ocean by an inlet called "Little Inlet." To the eastward on the chart lies a similar strip of shallow salt water, and this, in turn, by various bays, inlets, and larger indentations, connects directly with the broader and much deeper Great South Bay. The entire surface and waters of Long Island are included within the Eastern district of New York. Along the south shore of the Island runs a series of bars and strips of sand, in some places forming a substantial beach, and in others consisting merely of shoal water in front of the main land, at a greater or less distance therefrom. These beaches and bars constantly shift, and, as will be shown later, extreme and frequent as well as violent changes have occurred in the beach in front of the water called the "Bay of Far Rockaway" on many occasions during the past century.

At the present time, the condition of the locality called the "Bay of Far Rockaway" is very different from that shown on the government charts, and not only has the tidal portion been materially reduced in extent, but Little Inlet seems now to have no connection with the Bay of Far Rockaway. The eastern portion of the bay has entirely disappeared, and the mainland and the former beach are directly connected by a dry section of sand. A new inlet, smaller in many ways than the Little Inlet shown upon the charts, has been forced through the beach, at one point and then at another, with a general tendency to work westerly, thereby shortening the extent of the Bay of Far Rockaway, and increasing the amount of the solid mainland immediately east of the inlet. As shown by the moving papers herein, some seven bridges on trestles, at heights varying from five to six feet above the level of high water, have been built across the water now comprising this bay. These bridges have no draws, and no permit has been obtained from the War Department for their erection, with the exception of

one, the second bridge counting from the east. For this bridge a permit was granted by the War Department, on July 16, 1895, allowing the erection of a trestle with a draw. The statement upon which the application for this permit was made is as follows:

"To the Honorable Secretary of War, Washington, D. C.—Dear Sir: The Ocean Causeway Company propose to build a causeway and bridge across Far Rockaway Bay to connect Hicks Beach, Long Island, with Shelter Island, New York, for the purpose of giving to the residents of that locality access to said island with vehicles. The depth of water in the channel way where it is proposed to erect this bridge varies from one to four feet at mean low water, and the proposed draw span in the new bridge of at least thirty-five feet in the clear, will make navigation in the neighboring waters unobstructed. We therefore respectfully request that you will grant us authority to build said bridge and causeway subject to any conditions you may deem proper to impose. Accompanying this is a plan of the bridge and drawings showing its location. Very respectfully, Geo. C. Rand, Prest.,
"107 Wall St., New York."

It further appears from the moving papers (affidavit of James Stillwaggon, verified March 18, 1907) that in 1903 this draw was closed and permanently fastened, during the course of rebuilding by the defendant corporation.

Through the access gained by these bridges a substantial use of the beach for bathing purposes has been made possible, and large bath houses have been erected. Recently the defendant the Banister Realty Company applied to the War Department for a permit to pump sand from the Atlantic Ocean, for the purpose of filling in to the north and east of the Bay of Far Rockaway, on certain territory owned by the company, and such permit was granted in the following language:

"Referring to your application of March 31st, last, for permission to dredge sand from the Atlantic Ocean, at Far Rockaway, Long Island, N. Y., also to fill in land of the Banister Realty Company at that place, the area to be filled in being shown in red on blue print submitted, I beg to inform you that the War Department will interpose no objection to the proposed work, it being understood that there shall be no unreasonable interference with navigation thereby, that suitable provision shall be made to prevent the escape of the dredged material into Far Rockaway Bay and Mott Creek, and that this action does not authorize any injury to private property or invasion of private rights nor any infringement of local and state laws or regulations.
"Very respectfully, Robert Shaw Oliver,
"Assistant Secretary of War."

A pumping station was erected east of the location of the present inlet, outside of low-water mark, and the sand was piped over one of the bridges above mentioned and deposited on the mainland. The action of the storms, forcing the inlet gradually westward, undermined the pumping plant, and pierced the beach at a point just west of the pumping station, and almost in the exact spot where, some years ago, two bulkheads were constructed for the purpose of protecting the beach from the encroachments of the ocean. Part of the bulkheads were washed away, and the present inlet formed. This the defendants claim is in the neighborhood of 30 feet wide and 1 foot deep at low water, and 85 feet wide and 2 feet deep at high water, on an average, and is plainly shown on the photograph, Defendants' Exhibit M, March 16, 1907; the bath houses shown in this picture being to the west of the inlet. The piercing of the inlet at the present location

occurred about January, 1907, and the defendant company proceeded to drive a line of piling, and to reinforce the same by bags of sand, between the two lines of old bulkhead and directly across the inlet. At the time of driving the piling, this inlet was the only place in which the tide ran in and out to the section called the "Bay of Far Rockaway," and, as is shown by the chart submitted by the defendants, the water in the bay at high tide is never as high as in the ocean; the inlet not now being of sufficient capacity to allow the bay to fill up to the ocean level during the period of any flood tide.

The present action was brought by the United States to effect the removal of this piling, and the plaintiff also obtained an order to show cause why an injunction pendente lite should not issue.

At the various points at which cross-sections have been taken, as shown by the defendants' map No. 1,875, surveyed March 20, 1907, this body of water called the "Bay of Far Rockaway" is from 1 to 2 feet deep in the sections measured. As shown by the affidavits, the present bay is not only growing shallower, but, from the encroachments of the beach at the easterly end, and the building up of improvements on the mainland at the westerly end, it is filling in rapidly and becoming smaller in extent. The bridges above referred to are shown by photographs introduced by the defendants. A small sail boat, of a size suitable substantially for pleasure only, and almost within the class of a rowboat or skiff, is pictured near one of the bridges, resting upon the mud. A man beside the boat is in water not much above his ankles, indicating the depth of the water at the point where one of the largest bridges crosses.

A further examination of the affidavits submitted on behalf of the defendants, and of the charts accompanying these affidavits, shows that a record exists from as far back as 1802, when the beach as a whole, for a considerable distance east and west of the locality under discussion, extended in an unbroken stretch far to the south (that is, out in the ocean) from the present low-water mark. The first opening in this beach seems to have been Hog Island Inlet, which enters what is called "Broad Channel" and several bays forming the westernmost of the indentations directly connecting with Great South Bay. In 1836 the coast line had not changed, unless to work inland to a slight extent; but in 1862, 1863, and 1864 this solid beach was entirely washed out, and apparently the different portions of tidal water of Far Rockaway Bay date from that time. The various bars and beaches between the Bay of Far Rockaway and the Atlantic Ocean have been built up, and have shifted and changed continuously down to the present time. At all times, however, since 1864, there has existed some beach or bar between the Bay of Far Rockaway and the Atlantic Ocean, and the limits of the bay have been more or less distinct. In 1879 the beach itself was far to the south of where it is now and much wider in extent. The bay, also, was then several times larger than at present. Hog Island Inlet, of which mention has been made, has shifted to the west and to the east of where it was at the beginning of these records, but is now not far from the original locality. In 1896, and again in 1900, the shifting of the beach and the cutting of a new inlet began to narrow the bay, threatening its complete de-

struction, unless the filling in from the northward and eastward is halted, or unless the mainland is further washed out by the action of the ocean.

At various points to the west, the north, and the east of the present bay, improvements in the way of buildings, roads, and docks have not only protected the mainland, but caused the deposit of sand and a gradual encroachment upon the waters of the bay from filling in by the tides. The effect also of the building of the bridges and of the structures erected upon the beach has been to interfere with the force of the tides and of storms and to increase the rate of filling up from natural causes. It may be questioned whether, if left alone, the bay would not soon become a mere channel, or disappear entirely, if no extraordinarily severe storm or attack by the ocean occurs, and under this natural process the navigable character of this, as of any portion of tidal water, may be entirely lost. When so lost, the land would come under the exclusive jurisdiction of the state of New York.

Many of the allegations of the defendants as to the condition and capacity of the waters of the Bay of Far Rockaway are controverted by the affidavits upon which the original order to show cause was granted and those filed on behalf of the United States at the hearing of this motion.

The affidavit of Harry T. Kerr, verified March 15, 1907, shows that between his first examination and the 9th day of March, 1907, the line of piling had been completely extended across the inlet in question, and that bags of sand had been placed along the piles, in order to facilitate the deposit of sand by the ocean. Attached to Mr. Kerr's affidavit is a blue print sketch outlining the position of the inlet and the trestle and pump for the deposit of sand upon the mainland by the Banister Company.

Cornelius D. Curnen, in an affidavit verified March 2, 1907, states that Shelter Island Inlet is 200 feet wide and contains 6 feet of water at full tide; that during the past year motor boats and sail boats have been constantly using this inlet in going to and from the bay and ocean; that a large pile driver went in and out in the spring of 1906; that a large amount of sewage empties into the bay; that the bay extends over some 80 or 100 acres of land and contains fish.

Edward Roche, in an affidavit verified March 2, 1907, states that the inlet has been used by him frequently for ingress and egress by means of a launch during the past year; that the inlet is about 200 feet wide at high tide, and about 40 feet wide at low tide; and that there are at least 6 feet of water at high tide. Mr. Roche further swears that the erection of the piling has interfered with navigation; that Far Rockaway Bay has been within his knowledge a navigable body of water for vessels of pleasure and commerce for the last 40 years.

Stephen Stillwaggon, in an affidavit verified March 5, 1907, states that he has used the inlet for fishing, going in and out with a power boat of three feet draft; that he has been unable to do so since the driving of the piles by the defendant.

Elias H. Abrams makes an affidavit as to fishing and using a motor boat within the past year, and to using the inlet for ingress and egress

with the motor boat in the fishing business. Stephen Ambrose and William H. Stillwaggon make identical affidavit with Abrams.

Lawrence P. Boyle verified March 16, 1907, an affidavit stating that he found two feet or more of water March 14, 1907, at low tide, at the mouth of the inlet south of the line of the defendants' piling.

The defendants admit that the pile driver above mentioned was taken through the inlet, but allege that it had to be dragged through.

The photographs introduced in evidence by the government show various views of the locality, and the blue print survey shows that, the water being shallow, there is a considerable difference in the area covered by the bay at low and at high tide.

The general situation outlined in the affidavits of both sides to this question is similar to that existing at many other points along the south shore of Long Island. There are numerous small arms of the sea and streams having access directly to the Atlantic Ocean capable of use by pleasure craft and smaller boats for commercial purposes at high tide. Some of these waters at low tide are inaccessible to any boat except a skiff, and the tide ebbs and flows in most of them to a point far beyond where any use can be made of the outlet to the main ocean either for pleasure or business. The physical condition of these various localities, generally, brings these waters within the jurisdiction of the United States. They are geographically a part of the state of New York; but, as to some phases of the federal jurisdiction, discretion is vested by Congress in the Secretary of War and in the War Department of the United States government with relation to the use of the waters by individuals.

By chapter 907 of the Laws of 1890, Congress forbade the construction of any bridges or other works over or in the navigable waters of the United States, which would obstruct or impair the navigation or commercial use of such waters, or would alter or modify the channels of said navigable waters, without first obtaining the approval of the Secretary of War. 26 Stat. 453, 454. By section 10 of the same act, any person or corporation guilty of creating or continuing any such unlawful obstruction, or violating the provisions of the act, was declared to be guilty of a misdemeanor, and, on conviction, punished by a fine or imprisonment. This section (section 10, 26 Stat. 453) further provides that:

"The creating or continuing of any unlawful obstruction in this act mentioned may be prevented and such obstruction may be caused to be removed by the injunction of any Circuit Court exercising jurisdiction in any district in which such obstruction may be threatened or may exist; and proper proceedings in equity to this end may be instituted under the direction of the Attorney General of the United States."

This law was amended and re-enacted by chapter 158, Laws 1892 (27 Stat. 88–116 [U. S. Comp. St. 1901, p. 3527]), and again by Laws 1899, c. 425 (30 Stat. 1151 [U. S. Comp. St. 1901, p. 3540]), and further amended by the Act of February 20, 1900, c. 23 (31 Stat. 31).

Jurisdiction over the navigable waters of the United States is given to the United States government by certain provisions of the Constitution, infra. The different states thereby conferred admiralty,

maritime, and interstate commerce jurisdiction upon the general government, when they ratified and adopted the Constitution as a whole, and in defining this jurisdiction many decisions have interpreted the words "navigable waters of the United States." But in these discussions upon the subject of the jurisdiction of the United States over navigable waters two entirely different lines of cases have developed. While the principles of both lines of decisions are clear, and while most of them fall clearly under one principle or the other, it is necessary, for the purposes of this motion, in considering the provisions of the law above set forth, to examine the derivation and development of each of these doctrines.

The provision of article 1, § 8, subsec. 3, of the Constitution, giving the United States jurisdiction over commerce with foreign nations and among the several states, is the basis of one of these lines of cases. Interstate and foreign commerce, as such, when conducted upon rivers, streams, or tidal water, by any kind of craft, is subject to federal regulation and control, and the limits of this jurisdiction and the tests of navigability depend on the possibility of carrying on such interstate commerce. This principle is well exemplified in the case of State of Pennsylvania v. Wheeling & Belmont Bridge Company, 59 U. S. 421, 15 L. Ed. 435. A bridge in that case, constructed over the Ohio river between the states of West Virginia and Ohio, was held to be within the control of legislation, from the power of regulating commerce among the several states conferred upon Congress by the Constitution:

"The regulation of commerce includes intercourse and navigation, and, of course, the power to determine what shall or shall not be deemed in judgment of law an obstruction to navigation." State of Pennsylvania v. Wheeling & Belmont Bridge Co., supra.

Riparian rights and the interests of private individuals to the center of a stream, or to land under water, have been considered in many cases, under this general power to regulate interstate commerce, and in so doing to legislate with reference to the carrying on of such commerce by means of navigation. Various cases cited in this opinion, such as Leovy v. United States, 177 U. S. 621, 20 Sup. Ct. 797, 44 L. Ed. 914, Egan v. Hart, 165 U. S. 188, 17 Sup. Ct. 300, 41 L. Ed. 680, and others, depend for the test of navigability upon this possibility of interstate commerce.

In Leovy v. United States, supra, the subject is discussed at length. At page 628 of 177 U. S. and page 801 of 20 Sup. Ct. (44 L. Ed. 914), the court reviews the various definitions of "navigable waters" within the meaning of the statute above referred to.

The case of Egan v. Hart, supra, contains the following language, applicable in effect to the present situation:

"Between these two points it is nothing but a high-water outlet, going dry every summer at many places, choked with rafts and filled with sand, reefs, etc. It has no channel. In various localities it spreads out into shallow lakes and over a wide expanse of country, and is susceptible of being made navigable just as a ditch would be if it were dug deep and wide enough and kept supplied with a sufficiency of water."

In The Daniel Ball, 77 U. S. 557, 19 L. Ed. 999, it is said:

"And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

The Montello, 87 U. S. 430, 22 L. Ed. 391, contains the following:

"If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river."

In the report of the Leovy Case, supra, the charge of the trial judge to the jury is reviewed in detail; the case having originated upon an indictment under the criminal provisions of the statute. The Supreme Court of the United States holds that the possibility of working from one river to another, and from that river to still others, and by means of the different waters eventually to the ocean, is not the true test of the possibility of interstate commerce, nor of what is navigable water of the United States. In the opinion the court quotes from the charge of the trial judge:

"Nearly all the streams on which a skiff or small lugger can float discharge themselves into other streams or waters flowing into a river which traverses more than one state, and the mere capacity to pass in a boat of any size, however small, from one stream or rivulet to another, is sufficient to constitute navigable water of the United States."

But with this the Supreme Court disagrees, and comments as follows:

"Such a view would extend the paramount jurisdiction of the United States over all the flowing waters in the States. * * * If such were the necessary construction of the statutes here involved, their validity might well be questioned. But we do not so understand the legislation of Congress."

The court further on in the Leovy Case cites with approval the following statement of Chief Justice Shaw of Massachusetts, in Rowe v. Granite Bridge Corporation, 21 Pick. 347:

"Very different was the view expressed by Chief Justice Shaw when he said it is not 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water, which is deemed navigable, but in order to give it the character of a navigable stream it must be generally and commonly useful to some purpose of trade or agriculture.'"

But the Supreme Court then says:

"Nor can it be contended that the Red Pass, at the time the dam was built, was open to the Gulf. It was shown that the Gulf end of the pass had closed up, so that to get to the sea it was necessary to go out of Red Pass into Tiger Pass, Tontine Pass, and Grand Pass, which are open to the Gulf."

The court ultimately held that the acts of Congress relating to the obstruction of navigable water, above referred to, are not intended to apply to the case of a stream of the history and character disclosed in the record of that case.

It is stated in all the cases heretofore cited that the question of navigability is one of fact, and in Egan v. Hart, supra, the court plainly takes into consideration only the character of the water course

as a whole, and not the question whether navigation may be possible at the exact point, without reference to the conditions immediately above and below.

On the southern shore of Long Island the bays, inlets, and small streams communicating directly with the Atlantic Ocean necessarily possess one element of the standard of navigability, for purposes of interstate commerce, established by the various statutes and decisions. It is possible to pass from any of the sea coast states by means of the Atlantic Ocean to the entrance of these different bays and indentations. In most of them local as well as interstate commerce is actually carried on, to a greater or less degree. In some of them interstate commerce may be interrupted for a long period, or the use of the water may be almost entirely for pleasure purposes, but the possibility of access is ever present, and the question of use and capacity must be the test as to the extent of the jurisdiction of the United States under the interstate commerce provision of the Constitution.

The second line of cases arises from a different constitutional source of federal jurisdiction, under the interpretation of the words "admiralty and maritime jurisdiction." "The judicial power shall extend * * * to all cases of admiralty and maritime jurisdiction." Const. art. 3, § 2, subsec. 1. Section 563 of the United States Revised Statutes, subdivision 8 [U. S. Comp. St. 1901, p. 457], gives District Courts of the United States jurisdiction "of all civil causes of admiralty and maritime jurisdiction." This was but a re-enactment of the judiciary act of September 24, 1789, c. 20, 1 Stat. 77, giving to the District Courts "exclusive cognizance of all civil causes of admiralty and maritime jurisdiction." Criminal jurisdiction is also given to the United States courts by many statutes relating to these subjects.

In the case of The Genesee Chief, 53 U. S. 443, 13 L. Ed. 1058, Chief Justice Taney distinguishes between these doctrines, and holds that Act Feb. 26, 1845, c. 20, 5 Stat. 726, extending the jurisdiction of the District Courts to certain cases upon the lakes and navigable waters connecting the same, would be unconstitutional if it depended upon the power of Congress to regulate commerce alone. He argues that, if such jurisdiction could be inferred from the power to regulate commerce, it would necessarily follow that Congress could establish a court of admiralty, and do away with trial by jury, "over the cars engaged in transporting passengers or merchandise from one state to another." The court says (page 453 of 53 U. S. [13 L. Ed. 1058]) that if the law, namely, that of 1845, is constitutional, it must be supported on the ground that the lakes and navigable waters connecting them are within the scope of the admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted. In England, admiralty jurisdiction, according to Chief Justice Taney, was always spoken of as confined to the tidal water, and he considered that definition to be sound and reasonable, because in England there was no navigable stream beyond the ebb and flow of the tide; that at the time of the adoption of the Constitution a similar definition was proper here, the old thirteen states being almost entirely limited to tide water for navigation. Courts of

admiralty then exercised their jurisdiction to the head of navigation
and of tide water on the public rivers. But Chief Justice Taney fur-
ther says that, with the growth of the country, it would be unjust to
preserve such an artificial and arbitrary distinction, or to subject, un-
der the Constitution of the United States, one part of a public river
to the jurisdiction of a United States court, and to deny it to another
part, equally public and but a few yards distant. The court there-
fore decides that the admiralty and maritime jurisdiction of the United
States courts extends beyond the limits of the tide waters, and as this
doctrine has been interpreted in further cases, such as Malony v. City
of Milwaukee (D. C.) 1 Fed. 611 (relating to a collision on the Erie
Canal), Ex parte Boyer, 109 U. S. 629, 27 L. Ed. 1056 (declaring the
Illinois & Lake Michigan Canal navigable water), The Daniel Ball,
and The Montello, supra, it is evident that the term "navigable waters
of the United States" applies: First, to all waters capable of sustain-
ing or being used for interstate commerce or foreign commerce; and,
second, to all waters under the admiralty and maritime jurisdiction
of the United States, and over which the District Court of the United
States can exercise its peculiar admiralty jurisdiction.

Thus it is apparent that bodies of water, which as a whole come un-
der the admiralty and maritime jurisdiction of the United States, may
not in their entirety stand the test of navigability established in the
Leovy and other cases, supra. These bodies of water might be con-
sidered navigable water of the United States, and the jurisdiction of
Congress with reference to legislation attach thereto, and yet but a
portion of those waters be subject to a jurisdiction limited to a capacity
for interstate commerce. It would follow that the admiralty and mari-
time jurisdiction is broader than the jurisdiction acquired under the
interstate commerce provision. One of the most instructive cases upon
this question is that of The Hazel Kirke (C. C.) 25 Fed. 601, decided
by Judge Benedict, in the Eastern district of New York, affirmed by
Circuit Court. This case arose out of a proceeding in admiralty to
enforce a lien under section 4465 of the Revised Statutes of the United
States [U. S. Comp. St. 1901, p. 3046], with reference to the carry-
ing of passengers. The Hazel Kirke was a ferryboat operating in
Jamaica Bay, in connection with a railroad running to points at or
east of Far Rockaway. Jamaica Bay is a much larger body of water,
in the near neighborhood of the Far Rockaway Bay under considera-
tion in this case. Judge Benedict held that, although all of the places
touched by the vessel in her trips about Jamaica Bay were within the
state of New York, nevertheless, as Jamaica Bay is directly connected
with the ocean, and as the waters of the bay are within the admiralty
and maritime jurisdiction of the United States, Congress had authori-
ty to legislate with reference to a vessel on such navigable water of the
United States, and to treat such a vessel and such a body of water
as capable of being used in interstate commerce, and made subject to
laws regulating interstate or foreign commercial transactions. The
court therefore says, referring to the case of The Daniel Ball, supra:

"The decision in that case, therefore, compels a decision in this case that
the waters of Jamaica Bay are under the direct control of Congress in the
exercise of the power conferred by the commercial grant."

And that:

"Manifestly it is not possible for Congress to fully control and adequately protect commerce with foreign nations and among the several states, when that commerce is pursued by means of vessels navigating the public waters of the United States, without controlling the navigation of all vessels navigating such waters, not only those engaged in commerce with foreign nations, and among the several states, but those engaged in domestic commerce, and those engaged in no commerce at all, like the yachts. Accordingly, Congress has undertaken to regulate the lights to be carried by all vessels navigating such waters, and the courses to be pursued by all vessels meeting upon such waters, and these regulations are supreme and binding upon all vessels there navigating, because only by controlling in those particulars the navigation of all vessels navigating such waters can the safe navigation of vessels engaged in interstate or foreign commerce upon such waters be secured."

Under this standard the Hazel Kirke was found to be engaged in navigating public waters of the United States. It is considered that the term "navigable waters of the United States" covers every part of any body of water, tidal or otherwise, any portion of which is capable of use in the ways defined in the Hazel Kirke Case, and which are subject to the admiralty and maritime jurisdiction of the United States. It then follows logically that Congress should regulate interstate or foreign commerce thereon.

The case of In re Garnett, 141 U. S. 1, 11 Sup. Ct. 840, 35 L. Ed. 631, arose upon a consideration of the doctrine of the law of limited liability as a part of the maritime law of the United States, with relation to its application to vessels engaged exclusively upon an inland river above tide water. In the opinion the court holds that the doctrine of limited liability is a part of the maritime law, and that Congress has the power to legislate within the boundaries of maritime jurisdiction on the subject of maritime law.

"As the Constitution extends the judicial power of the United States to 'all cases of admiralty and maritime jurisdiction,' and as this jurisdiction is held to be exclusive, the power of legislation on the same subject must necessarily be in the national Legislature, and not in the state Legislatures. It is true we have held that the boundaries and limits of the admiralty and maritime jurisdiction are matters of judicial cognizance, and cannot be affected or controlled by legislation, whether state or national. Chief Justice Taney, in The St. Lawrence, 1 Black, 522, 526, 527; The Lottowana, 21 Wall. 558, 575, 576, 22 L. Ed. 654. But within these boundaries and limits the law itself is that which has always been received as maritime law in this country, with such amendments and modifications as Congress may from time to time have adopted."

If the entire body of admiralty and maritime law is exclusively within the jurisdiction of the United States government, and Congress has power to legislate upon all matters and subjects with respect to which legislation is necessary in order to carry out the full exercise of that jurisdiction, it seems evident that legislation covering the management of vessels, the control and establishment of harbor lights, the deepening and maintaining of channels and waterways, and eventually the regulating of obstructions to navigation, comes as certainly and directly under the administration of the admiralty and maritime judicial functions as the power to improve waterways, control the conduct and operation of railroads, and direct the management and handling

155 F.—38

of steamboats, can be within the jurisdiction of the national government, because of the provisions of the Constitution granting to Congress of the United States authority to regulate interstate commerce. Strict construction of the latter section would mean that no supervi-. sion or legislation could be had unless the act or matter supervised was actually at that time a part of a transaction constituting interstate commerce. That this is not the true interpretation the many cases cited in this opinion plainly show, and it seems to follow as plainly that the jurisdiction of Congress in enacting the law of 1888 and its amendatory provisions can be sustained both under the provision relating to interstate commerce, and also that relating to admiralty and maritime jurisdiction, and that the limits of legislation in this regard are not confined to either of these provisions as distinguished and separate from the other. "It is not questioned, that whatever may be necessary to the full and unlimited exercise of admiralty and maritime jurisdiction is in the government of the Union. Congress may pass all laws which are necessary and proper for giving the most complete effect to this power." United States v. Beavans, 16 U. S. 387, 4 L. Ed. 404.

Originally, admiralty jurisdiction extended over all matters on the sea, and as far as the tide rose and fell to low-water mark; the space between high and low water coming within the admiralty jurisdiction when covered by the ocean, and again partaking of the character of the land as the ocean receded. On the continent of Europe, under the civil law, admiralty jurisdiction has always preserved its wide scope. In England, however, the courts of common law claimed jurisdiction over matters occurring "within the realm," and by St. 13 Rich. III, c. 5, the admirals and their deputies were restricted to things done "on the sea." By St. 15 Rich. II, c. 3, admiralty jurisdiction and common-law jurisdiction were more closely defined, and ultimately all offenses were placed under certain courts, and the entire admiralty jurisdiction regulated by St. 28 Hen. VIII, c. 15, St. 4 & 5 Wm. IV, c. 36, and St. 7 & 8 Vict. c. 2. See, Queen v. Keyn, 2 Ex. Div. L. R. 66. The admiralty jurisdiction in England, therefore, at the time of the adoption of a Constitution by the various states of the American commonwealth was much narrowed in scope. "Admiralty jurisdiction, as exercised in the federal courts, is not restricted to the subjects cognizable in the English courts of admiralty at the date of the Revolution, nor is it as extensive as that exercised by the continental courts, organized under, and governed by, the principles of the civil law"— citing Bags of Linseed, 1 Black, 108, 17 L. Ed. 35; The Belfast, 74 U. S. 636, 19 L. Ed. 266. Bodies of water subject to the ebb and flow of the tide were at common law "deemed to be navigable and were held to be royal rivers, or the property of the crown. They were placed on the same footing as the sea, and regarded as public highways. This rule of the common law became a part of the fundamental law of this state by the adoption of the original Constitution of 1777." This rule "governs in cases where the rights of riparian owners to waters subjected to tidal influences are in question. To the rights of the crown the people of this state succeeded, upon their separation." Roberts v. Baumgarten et al., 110 N. Y. 380, 18 N. E. 96; also, State of Pennsylvania v. Wheeling and Belmont Bridge Co., supra.

All the powers, however, of sovereign states and of constitutional jurisdiction were acquired by and vested in the states formed out of the American colonies when their independence was recognized and their separate existence permanently established. In the adoption of the American Constitution, the states delegated this admiralty and maritime jurisdiction to the courts of the federal government, by the phrase "all admiralty and maritime jurisdiction." Article 3, § 2, supra. Also, by article 1, § 8, subsec. 18 of the Constitution, Congress was given power to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof." And, as above stated, by article 1, § 8, subsec. 3, Congress was empowered to "regulate commerce with foreign nations and among the several states." Upon these provisions depend the authority of Congress to improve and supervise highways and waters for the purposes of navigation, and to control the use of those waters for interstate commerce. Congress, therefore, had authority at the time of the passage of the various acts (Act Sept. 19, 1890, c. 907, 26 Stat. 452 [U. S. Comp. St. 1901, p. 3527], Act July 13, 1892, c. 158, 27 Stat. 111 [U. S. Comp. St. 1901, p. 3527], Act March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3540], and Act Feb. 20, 1900, c. 23, 31 Stat. 31) to legislate with reference to obstructions to navigation, where that navigation came within the provisions of interstate commerce, or within the admiralty and maritime jurisdiction of the United States.

It has been frequently held that the admiralty jurisdiction of the United States attaches to all such bodies of water as the bays, indentations, and streams in which the tide ebbs and flows along the south shore of Long Island, and this admiralty jurisdiction can be lost only when the particular water loses the character of a stream capable of carrying on interstate commerce or of navigation in and out from the ocean for pleasure and business purposes. Under this construction, Far Rockaway Bay, unless it has so lost the character of navigability as to be outside of the admiralty and maritime jurisdiction of the United States courts, is subject to the provisions and regulations of the act of 1890, as amended by the acts of 1892, 1899, and 1900. The United States having jurisdiction in the matter of improving navigable channels and regulating and controlling such channels for commerce, it would seem to follow that if an inlet leads directly from the ocean to a greater or smaller body of tidal water, through which is located a channel which is capable of being navigated, this whole body of water would be under the direct control of the government in the exercise of its jurisdiction. A large portion of the water might be shoal and utterly unfit for navigation of any sort, in its natural condition; but the filling in or altering of the locality outside of low-water mark would have a material effect upon the currents and tides, and directly bear upon the maintenance and improvement or deterioration of the channel itself.

In the case at bar, the permit formerly issued by the War Department to build a bridge on trestle work, with a comparatively narrow draw, would indicate that the use of the entire bay for purposes of

navigation was not deemed necessary and that a comparatively narrow channel leading up from the inlet would serve all reasonable necessities of the persons using the bay; but it undoubtedly follows that control over this narrow channel, as before stated, includes discretion as to any artificial alteration of the entire body of water directly adjoining or affecting the narrow channel. The inlet itself, at some times much deeper, sometimes, perhaps, almost entirely filled in for a short period, is a channel of the sort which the government of the United States could improve and keep in a condition fit for such use as might seem necessary. The right to make such improvements and to control the narrow channel, the adjoining shallow bay, and the inlet affording access thereto, must therefore necessarily vest in the United States government until the navigable character or possibility has been actually lost.

As has been said before, each of the cases in which an interpretation of the statute, under present consideration, has been made, has arisen from a criminal prosecution, and the question of the jurisdiction of the United States has been made to depend upon questions of navigability, and treated as a question of fact.

Upon a motion for a preliminary injunction pending the trial of an action in a suit brought in equity, in which the sole relief asked is a permanent injunction and the removal of a structure alleged to offend against the statute, it is extremely difficult to distinguish between the issue of fact upon which the entire case depends and a prima facie case on which the application for a temporary injunction may be heard, and it is necessary to remember that the evidence taken upon the trial might materially vary from that appearing by the affidavits upon this motion, and substantially change the whole situation.

It is evident that if the water of Far Rockaway Bay has possessed the elements of navigability bringing it within the authority of the United States, and governed by the Constitution and by the acts of Congress, the character of the bay may be changed by storms, or by illegal use, until such time as the navigable capacity has been entirely lost, and until the effect of the illegal structures has deprived the United States of the possibility of restoring the navigable character of the water by the removal of the structures. It is akin to the situation that frequently arises in equity, where the test is whether the parties can be restored to their original situation. In the present case, affidavits are filed on behalf of a large proportion of the property owners and inhabitants around Far Rockaway Bay, stating that they do not consider the bay navigable water, and that they intend to fill in and improve their properties by doing away with the bay, if permitted so to do. Especially if the present line of piling across the mouth of the inlet should be allowed to stand for a sufficient period, and if no severe storm should wash away the entire beach at this point, it seems evident that Far Rockaway Bay would become merely a sewer or stagnant pool unless filled in and made dry land. If the temporary injunction is not continued, it is difficult to see how there would be any rights to litigate, if the case is not brought to a very speedy trial. Such a result would appear to be irreparable damage, especially in view of the apparent disregard for the provisions of the United States statutes by

the persons erecting and maintaining the various bridges without permits across the bay, and in the driving of the original piling.

By the provisions of the statute, the War Department, if it considers the water navigable, and if it deems a bridge a material obstruction to navigation or to the navigable capacity of this bay, may order, after a public hearing, the removal of the offending structure, or its change by the insertion of draws of some form which will meet with the approval of the Secretary of War. In the present situation, the facts that the War Department has heretofore issued permits for a bridge and for the pumping of sand, and has made the present application for an injunction, show that it considers Far Rockaway Bay to be navigable water. The issuing of the permit for a bridge erected on piles, with a draw, indicates that the Secretary of War has exercised, and might again exercise, his discretion in allowing the bay to be bridged, or to be filled in outside of the preservation of a suitable channel. With reference to the structures already erected across the bay, a public meeting, such as is provided by the statute, and a suitable examination on the part of the War Department, would probably result in a solution of this question which would do justice to all concerned.

By the affidavit of Maximilian Morgenthau, verified March 15, 1907, it appears that a second or artificial inlet has been or is being made to furnish a safe and stable or permanent outlet and inlet to the bay, some distance west of the inlet which the defendants attempted to close by the line of piling. So long as the new inlet did not affect the navigable character of any of the waters, and so long as its excavation did not cause the washing out of sand or other material into the bay, its construction would not be affected by the provisions of the statute. But if such an inlet should be created, upon its completion it might constitute navigable water, and as such pass under the jurisdiction of the government, even though created through private property. The War Department could approve of the location and construction of such an inlet, and could authorize the closing of the present inlet, if the new one, in the opinion of the Secretary of War, would more certainly answer the requirements of the situation. The very fact that such discretion is vested in the Secretary of War, and that no application has been made to him, and the impossibility of justly deciding upon the whole situation with reference to the question as to whether Far Rockaway Bay has at the present time lost all of the elements of navigable waters of the United States, illustrates the necessity of securing a continuation of conditions in their present state pending the determination of the matter.

The owners of the shore front have a right to take such steps as they may see fit upon their own land to prevent the change in location by the present inlet, or to prevent erosion along its banks or upon the beach proper. But unless the discretion of the War Department is exercised in their favor, or until a final decision can be had determining the ultimate character of the bay, the property owners should be restrained from closing the channel of the inlet itself, or from so using their property as to effect the closing of the channel by causing the deposit of sand and other material therein.

From all of the foregoing, therefore, it would seem that, without deciding at this time the issue of fact as to whether Far Rockaway Bay at the present moment has lost the character of navigable water, it seems necessary to continue the temporary injunction pending the determination of the trial.

The granting of such temporary injunction cannot carry with it the removal of the alleged illegal structure in so far as it has been already erected, nor can this action furnish relief with reference to the various bridges if changes should be desired with relation to them. The other provisions of the statute must be invoked if the War Department or any of the parties interested in the situation deem it proper to test those questions. The trial of the action should be facilitated in every way in order that as little opportunity as possible for damage by storm should result, and an order may be presented continuing the temporary injunction pending the determination of the action.