**UNITED STATES et al. v. TURNER.**

No. 12597.

United States Court of Appeals
Fifth Circuit.

June 10, 1949.

---

A. Devitt Vanech, Asst. Atty. General, Ralph J. Luttrell, D. Murnan Smith, Attys., Dept. of Justice, Washington D. C., Percy C. Fountain, U. S. Attorney, Mobile, Ala., Albert J. Tully, Charles Hoffman, Mobile, Ala., for appellants.

Palmer Pillans, Mobile, Ala., for appellee.

Before HUTCHESON, SIBLEY, and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

Brought by the United States to condemn land described as a portion of Pinto Island near Mobile, Alabama, and to determine ownership of the land and the money awarded, the suit was fully tried on the issue of title by a master and on the issue of value by a jury.

The claim of the United States to the title was that most, if not all, of the land described, was, before its filling, submerged land of Mobile Bay lying below high tide and owned by the State of Alabama, and that the State had granted its title to the United States.

The claims of appellee were: (1) that Pinto Island, submerged and unsubmerged, was a defined area susceptible to grant as waste and unappropriated land of the United States and that, by title under the patentee, he is the owner of all of it, whether above or below mean high tide, which constituted the southern portion of the island; and (2) if not, that a considerable part of the land described is fast land which he owned, and that the filled in part became his as added by artificial accretion.

Referred to the master on the issue of title, there was a full hearing, followed by findings, and a report against the claims of appellee. The effect of these were: that all of the land condemned was submerged land, lying below mean high tide, which had

WALLER, Circuit Judge, dissenting in part.

been filled in; that the title to it before it was filled in was, therefore, not in appellee, but in the State of Alabama; and that its filling could not and did not divest the State's right and title to it and vest them in appellee.

Upon exceptions to the report, the district judge held: that the burden was upon the United States and the State of Alabama to overthrow appellee's claims to the land sought to be condemned by showing that none of it was fast land; or, failing in this, how much of it was not; that they had failed to carry this burden, and appellee must prevail. He held, too: (1) that the waters flowing over Pinto Island were not navigable, in fact; that the State of Alabama did not, therefore, own the submerged portions of it; that it was all patentable and title to it all passed to the patentee and his grantors; and (2) that if while it was submerged, the State did own the submerged portions, the owner of the fast land had the right to fill them and follow the fill toward deep water. So holding, he rejected the master's report, determined the title in favor of appellee, caused the issue of value to be tried to a jury, and entered judgment on the verdict for $60,650.00.

The United States, complaining not at all of that part of the judgment fixing the value of the land condemned, but only of that part of it which adjudged appellee to be its owners, is here insisting that the judgment as to title was wrong and must be reversed.

As appellant sees and states it, this appeal presents a single question.[1] As appellee sees it, appellant's question properly put becomes two.[2]

Appellant's statement of the question

assumes that the evidence establishes without dispute that all of the land sought to be condemned was submerged land, that is below mean high tide until it was filled, and that no fact question was involved, only a question of law, whether appellee acquired title to it by his purchase, or, later, by filling it.

Appellee's statement of the question assumes that there is one question of fact, whether any of the land sought to be conveyed was fast land and how much, and two questions of law, to be resolved. One of these is whether because the bay was not navigable in fact over the flowed land, the entire island, that flowed as well as that unflowed by the tide, was subject to being, and was patented. The other was, if this is not so, whether, by filling it, appellee got title to it by artificial accretion.

Appellant urges upon us: that it is horn book law that title to land subject to the tidal flow of Mobile Bay is in the State of Alabama, and that if the evidence does not establish as matter of law, that no part of the land taken was fast land, it does fully support the master's finding that, at the time of taking, Turner had no natural fast land; that the district judge was, therefore, not justified in setting the findings of the master aside; and that his judgment should be reversed and here rendered.

A careful examination of the record, in the light of the findings of master and judge, convinces us that the evidence establishes beyond dispute: that nearly, if not quite, all of the land sought to be condemned is not true fast land but is land made by filling submerged land, that is land subject to tidal flow; and that if any of it at the time of the taking was natural fast land, it was only a small part.

---

[1] "Question Presented. Whether appellee, as former owner of a portion of an island situate in the navigable tidewaters of Mobile River and Mobile Bay, acquired title to lands which were formed by filling in the submerged lands of Mobile Bay below high-water mark as against the State of Alabama or its grantee, the United States".

[2] "Propositions Debated. There are two major thoughts involved. The first of these is primarily factual. The two sovereigns contend that Messrs. Turner and Hartwell took in 1904 only a tiny

piece of fast land; and that they dredged this away in 1906. This we deny earnestly, and insist that Turner & Hartwell got in 1904 the quite considerable parcel of land that then made the southern end of Pinto Island."

"The second involves the determination of title to the increase of the land-mass of Pinto Island, produced by artificial accretion; the great bulk of which consists of spoil from dredging—most of it from the bed of the Mobile River, though some of it, apparently, from the Bay."

It is at once apparent then that the question of fact as to whether at the time of the taking appellee had any true or natural fast land, is of minor importance in this case, and that the substantial, the important, questions in the case are questions of law arising as to the major part, if not the whole, of the land taken, the filled or made land.

Upon these questions, (1) whether Alabama had title to the submerged lands, and (2) whether, if it did, the owner of the fast land could acquire that title by filling them, the authorities leave in no doubt that the appellant has the right of it.

■ Upon his first point, appellee, in his excellent brief, citing the controlling authorities,[3] concedes that to Alabama belongs the navigable waters and soils under them. His only point is that since the waters flowing the island are too shallow for actual navigation, it cannot be said thereof that, though a part of Mobile Bay, they are navigable waters.

That this will not do is made plain not only by the common sense view which permits no distinction upon the ground of navigability between the shallows and depths of navigable waters, and by the authorities cited by appellant in Note 3, supra, but by Mayor, etc. of Mobile v. Eslava, 9 Port., Ala., 577, 33 Am.Dec. 325, and United States v. Banister Realty Co., C.C., 155 F. 583, cited by appellee. The two cases on which the district judge relied below and appellee relies here, Toledo Liberal Shooting Co. v. Erie Shooting Club, 6 Cir., 90 F. 680, and United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267, are not at all in point. They had to do not with the shallow parts of navigable waters but with bodies of water which were held to be nonnavigable.

On the second point, whether, though the owner of fast lands does not have title to submerged land adjoining while it remains submerged, he may acquire title by filling it, we are in no more doubt that appellant is right, appellee wrong. That loss of land by erosion and its gain by natural accretion do affect the title of owners of fast land is conceded by all,[4] and that if the lands taken had been added by natural accretion to appellee's fast land, he would have been entitled to it and to be paid for it, there is no doubt. Neither is there any that he may not by artificial filling of submerged land acquire the title from the State.[5]

■■ The principal invoked by appellee which supports the right of a riparian owner on navigable waters to obtain access thereto does not give the owner any title to the lands by which he obtains this access. In addition this right of access exists only as a kind of way of necessity to reach navigation.[6]

■ While, therefore, the riparian right of access as a way of necessity to reach the deep or navigable portion of the water, including the right to fill in over the shore exists in Alabama, that right where it exists, does not and cannot ripen into title against the state and its grantees. It does not exist here because the filling was not done under any necessity to reach, or for the purpose of reaching, deep water.

■ There remains only the question whether the judgment should be reversed and rendered, or whether it should be reversed and remanded with directions to ascertain and precisely determine the

3 Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565; Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267; Chamberlain v. Board of Comm., 243 Ala. 662, 11 So. 2d 724; Mayor, etc. of Mobile v. Eslava, 9 Port., Ala., 577, 33 Am.Dec. 325, to which may be added Mobile Trans. Co. v. Mobile, 187 U.S. 479, 23 S.Ct. 170, 47 L.Ed. 266; Martin v. Busch, 93 Fla. 535, 112 So. 274; New York Power & Light Corp. v. State, 230 App.Div. 338, 245 N.Y.S. 44, cited by appellant.

4 Abbot's Ex'rs v. Doe et dem., 5 Ala. 393; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S.Ct. 304, 56 L.Ed. 570; Greenfield v. Powell, 218 Ala. 397, 118 So. 556.

5 City of Mobile v. Sullivan Timber Co., 5 Cir., 129 F. 298.

6 McDonnell v. Murnan Shipbuilding Corp., 210 Ala. 611, 98 So. 887; Mobile Transp. Co. v. City of Mobile, 153 Ala. 409, 44 So. 976, 13 L.R.A.,N.S., 352; City of Mobile v. Sullivan Timber Co., 5 Cir., 129 F. 298.

amount of fast land owned by appellee which was taken in the condemnation, and how much of the amount awarded for the whole tract appellee is entitled to receive as compensation for the part taken from him.

In determining whether and how much fast land belonging to Turner was taken, we think the master gave too much weight to, permitted his judgment to be too much controlled by, maps and plattings, and the opinion of engineers thereon, too little by the oral testimony of Turner and others as to the fast land which he had in possession.

We are of the opinion, therefore, that instead of reversing and rendering, as contended for by appellant, on the ground that it was Turner's duty to establish his claim and that there is evidence to support the master's finding that no part of the land taken was fast land of Turner, justice requires that we reverse and remand with instructions to determine precisely the part of the land taken which was true fast land, that is originally fast land or formed by accretion, and what part of the fund awarded for the whole should be awarded to Turner.

Reversed and remanded.

SIBLEY, Circuit Judge (concurring).

I concur in what Judge Hutcheson has written and in the disposition given the case. I agree in what Judge Waller has written to the effect that any artificial dredging by Hunter of land which he owned would not deprive him of his title to the land which he thus put below water by this means.

I do not agree that the nature of this suit as a condemnation suit has ever changed. The United States, desiring immediate possession of the land in controversy to make a shipyard, surveyed the land desired, and described it by courses and distances in the petition and named ten persons, including Turner and the State of Alabama, as persons claiming an interest, and made them as well as "all persons, firms and corporations, known or unknown, having any right, title or interest", defendants to the proceeding. A fee simple title was prayed to be vested in the United States on payment into the registry of the Court of just compensation and an order was asked for immediate possession. The order for immediate possession was made, which recited that the United States had by Act of Congress made a certain and adequate provision for payment of just compensation and that the funds are available for payment. Turner answered that he was the sole owner and entitled to all the compensation to be fixed. The State of Alabama at first claimed taxes only. The United States moved for a determination of the title, asserting that Turner had owned land to the north but the land condemned was made by artificial filling of land theretofore submerged by the tide and was filled under authority of a deed from the State of Alabama to the United States, and that questions of fact were to be investigated, and there were "grave doubts of the title and ownership of any person or persons in said land, and of the kind of title", and that it was necessary to determine the title of every part of the land to make possible a proper determination of the value and the right of the various persons. A special master was appointed to this end. Thereupon the United States added a paragraph to its original petition, alleging itself to have title to all or a part of the lands under a deed from the State of Alabama, and an interest in the servitude for public navigation which impaired the value of the fee and prayed that its title and interest be fixed to ascertain the extent of the taking and the measure of just compensation. The State of Alabama also amended its claim and asserted that all the land belonged to Alabama, as now or formerly submerged by tidal waters. These three claims went to the Master for consideration.

While no money was paid into court, the credit of the United States was substituted by the statutes applicable. The primary object was attained of getting immediate and undisputed possession. Any right or title of the United States was not waived, but the United States, I think, stood like any other claimant of the pledged fund. Turner, Alabama and the United States had initially the same burden of identifying what land or interest, if any, each owned.

Neither had any presumption as against the other. It did not become a suit in ejectment, or trespass to try title, but remained a condemnation suit with a problem to be solved as to whose land had been taken, the burden being on each claimant to identify his land. The burden of course may shift as the evidence progresses.

It would be well for the survey made for the condemnation to be retraced on the land (or water) so that court and witnesses can tell precisely what they are dealing with. The building of the shipyard has altogether changed the appearance of things. I have not been able to satisfactorily locate the land condemned on the maps of the harbor, or that testified about as in the former possession of Turner.

HUTCHESON, Circuit Judge, concurs in the foregoing opinion.

WALLER, Circuit Judge (concurring in part and dissenting in part).

I agree with the majority that the case should go back and the physical facts as to the location of the parcel claimed by the United States in relation to Pinto Island and its natural accretions should be the decisive factors upon which the judgment is based rather than upon harbor maps projected by draftsman or engineers with no thought in mind of making surveys of land or correct delineation of land lines.

But I also entertain some views not expressed in the majority opinion:

1. The case—instituted as one in eminent domain, wherein the burden would have been on the landowner to establish title to any land claimed by him only where there was a contest with other defendants—was converted by the United States into a suit to try title between it and the Defendant, Turner. The Government initially set out toward the goal of acquiring title to the lands by a condemnation suit but now has reversed its field and is trying to run with the ball in the opposite direction. Its assertion that it does not now want condemnation but confirmation of a title that it already owns seems to me to be so utterly and violently inconsistent with proceedings in eminent domain as not to be permissible. The Federal Rules of Civil Procedure were not applicable to the trial of this case, and I am aware of no law or rule that would permit the joinder of actions so inconsistent as to be repugnant.

2. Even if such a turn-around is permissible, and the Government may now assert title to the land it formerly sought to condemn, the burden is on it, like upon every other plaintiff in a suit to try title, to go forward and to win on the strength of its own title rather than upon any weakness of the title of its adversary. The burden is on it to prove its title and to this end it must show that the land it claims is not a part of Pinto Island, as originally laid out and granted to Turner's predecessors, or as enlarged by natural accretions through the years. It ought also to show that the lands filled by ship ballast were not merely the reclamation of lands owned by Turner and theretofore dredged out by him in putting it to needful use.

3. My next divergent point of view is that the burden is on the United States for the further reasons that Pinto Island was surveyed by the United States and patented many years ago to the predecessors in title to Mr. Turner and the Government should have the burden of showing, if it intends to claim the land as its own, that the land involved is no part of Pinto Island as granted by the United States or as enlarged by natural accretions to that island.

Furthermore, the evidence shows not only the grant through mesne conveyances to Mr. Turner, but it shows that he has been in the actual possession of the land, not only by the building of a wharf, the driving of piling, the filling in behind piling, but through a watchman or caretaker that he has kept on the land for many years. Concededly this possession will not ripen into a bar or a prescriptive title against the United States or the State of Alabama; nevertheless, it is a universal rule that in a suit for trespass to try title, or in ejectment, the burden is on that one out of possession to show a better right thereto against one in possession, and even if we disregard the record title, it is undisputed that Turner had been in possession of the land involved for many years, and the

burden would still be on the United States to prove that it had a superior right or title in order to dispossess Turner.

I think when the case goes back, it should be with instructions to try it only as a suit in trespass to try title with the burden as usual upon the plaintiff.

The upland owner acquires title to all extension to his lands caused by natural accretions, and I take it that when title is once thus acquired he may defend his title against man, the sea, and the elements, and to that end he may artificially reclaim that which either man or nature has taken, or has sought to take, away. See Schwartzstein v. B. B. Bathing Park, 203 App.Div. 700, 197 N.Y.S. 490. Owning from the center of the earth to the skies, he does not lose his title to the State because his top soil is gone for a time.

I take it also to be the law that where title to land was acquired by accretion the land belongs as thoroughly to the upland owner as if he had bought and paid for it from the true owner, and that as owner of the title he may put the land to its highest and best use. For instance, he could dredge it out and make a yacht basin wherein to rent space to yacht owners. By thus utilizing his land he would not forfeit it to the State. He could fill up his basin at any time that he wished to change the use, and in filling it up he could accept ship ballast or spoil from federal dredging and thus reclaim that which was already his. By the same taken, Turner, a shipper of lumber, could construct a wharf on his land for shipping lumber and then dredge out the soil so that vessels could reach it. Putting his land to use was not an abandonment, an avulsion, nor an erosion that changed its boundary or title. By the same right that he put his land to its best use he could change that use and reclaim it artificially or otherwise. In other words, the adaptation of his land to this very substantial purpose by the expenditure of large sums in dredging and building a wharf and the maintenance of watchmen and caretakers is the exact opposite of an abandonment and has no relation to erosion, avulsion, or any other similar process of title or boundary involvement.

If it be true that Turner once had title to these lands, he will not lose same by his dredging or by any method known to the law unless the expropriation without compensation here belatedly attempted shall succeed.

In 56 Am.Jur., Waters, § 493, p. 904, it was said:

"But there seems to be no doubt that if the riparian owner owns the fee to the bed of the stream, land newly formed by accretion belongs to him although it extends beyond the shore line as it existed before a washing away of the land which preceded the new accretion, and that if a navigable river suddenly encroaches upon adjoining private land, the title to the submerged portion remains in the former owner. When thereafter such land arises to the surface, whether by the deposit of alluvion or by a change in the channel of the stream, dominion reattaches thereto as if never suspended, and whatever accretions may have been added to the tract belong to its proprietor, as in ordinary cases."

In City of St. Louis v. Rutz, 138 U.S. 226, 11 S.Ct. 37, 34 L.Ed. 941, it was held that if an island or dry land forms upon that part of a bed of a river which is owned to the center of a stream in fee by the riparian proprietor the same is his property.

The contention of the Government that Turner dredged away a part of Pinto Island so as to make same available to vessels wishing to use his wharf has been argued, but it seems that the making of this portion of Turner's land navigable by artificial means would not result in the loss of his title thereto, and that this contention of the Government is not supported by the authorities. See 56 Am.Jur., Waters, § 211, p. 673, where it is said that:

"As a general proposition, the proprietor of a non-navigable stream or body of water neither loses any of his own rights therein nor subjects it to any public servitude by rendering it navigable by artificial means."

The same thing was held by the Supreme Court of Florida in Clement v. Watson, 63 Fla. 109, 58 So. 25, 27, Ann.Cas.1914A, 72, wherein it was said:

"The fact that a part of the cove was made navigable by artificial means after it became private property did not take away the right of the owner to control the fishing privileges therein subject to law. See Schulte v. Warren, 218 Ill. 108, 75 N.E. 783, 13 L.R.A.,N.S., 745.

This case is also authority for the proposition that in the United States waters are not regarded as navigable merely because they are affected by the tides, and that tide water must be navigable in fact to be navigable in law. The Court said:

"While the navigable waters in the state and the lands under such waters, including the shore, or space between high and low water marks, are held by the state for the purpose of navigation and other public uses, subject to lawful governmental regulation, yet this rule is applicable only to such waters as by reason of their size, depth, and other conditions are in fact capable of navigation for useful public purposes. Waters are not under our law regarded as navigable merely because they are affected by the tides."

The Supreme Court of Alabama supports the lower Court in its holding that whether or not the lands in question were under navigable waters was a matter of fact in the case of Sullivan v. Spottswood, 82 Ala. 163, 2 So. 716, 717, wherein it said:

"It is true that the flow and ebb of the tide is not regarded, in this country, as the usual or any real test of navigability; and only operates to impress, prima facie, the character of being public and navigable, and to place the onus of proof on the party affirming the contrary."

There is no evidence in this case of any avulsion which would have swept away the upland of Turner. In fact, the Government does not claim that there was any such avulsion but that the Defendant dredged away his own upland. As stated above, Turner had a right to improve his property, to dredge it out and to fill it back, but even if there had been an avulsion by hurricane, as the judge below suggested as a possibility, under the holding in State of Missouri v. Nebraska, 196 U.S. 23, 25 S.Ct. 155, 49 L.Ed. 372, avulsion no more changes the boundary between private individuals than it does the boundaries between States. The Court, in so deciding, quoted from Mayor, Aldermen and Inhabitants of New Orleans v. United States, 10 Pet. 662, 9 L.Ed. 573:

"It is equally well settled, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein."

Then follows a quotation from Gould on Waters, Sec. 159:

"But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates."

So even if there were an avulsion in Mobile Bay which changed the contour of the land, in the absence of abandonment or some sort of an estoppel, the boundaries would be the same, and Turner's title would remain within that same boundary, subject to being filled by alluvion or reclaimed by him through artificial means.

In Goforth v. Wilson, 208 Ark. 35, 184 S.W.2d 814, it was held that in an avulsion the boundaries of the riparian owner do not change with the course of the stream.

I agree that a new trial should be had, but that it should be in conformity to the views which I have attempted to set out.