11 So.2d 724

CHAMBERLAIN, Solicitor, v. BOARD OF COMMISSIONERS OF CITY OF MOBILE.

I Div. 183.

Supreme Court of Alabama.

Feb. 2, 1943.

664

Bart B. Chamberlain, Circuit Solicitor, of Mobile, Wm. N. McQueen, Atty. Gen., and Bowen W. Simmons, Asst. Atty. Gen., for appellant.

Robie L. Mitchell, of New York City, and Wm. G. Caffey, of Mobile, for appellee.

FOSTER, Justice.

This suit was filed under Article 13, Title 7, Code of 1940, sections 169 to 176, for the purpose of having the court determine the authority of the city of Mobile to issue certain proposed public improvement revenue bonds pursuant to sections 341 to 352, Title 37, Code of 1940, and the legality of the proceedings had in connection therewith, and the validity of the pledge of revenue contained in the resolution of the city commission adopted as required by law for their issuance.

The resolution is alleged to have been adopted August 25, 1942, and recites the fact that on June 20, 1939, a resolution was adopted and was amended July 19, 1940, under which the city has issued revenue anticipation bonds in the principal sum of $2,600,000, for the purpose of financing in part the cost of construction of a tunnel under Mobile River from a point at or near the intersection of Government Street and St. Emanuel Street in the city to a point on Blakely Island, connecting with the Old Spanish Trail, U. S. Highway No. 90.

Those bonds mature on May 1, 1969, and are redeemable.

It is now proposed to issue $4,500,000 to be dated May 1, 1942, and due as to principal May 1, 1969. The purpose is to redeem all the outstanding bonds, and to finance the cost to the city of constructing the Plaza Enlargement and the Parkway Improvements, as described in the resolution. Those terms are there defined as follows:

"(d) The term 'Plaza Enlargement' shall embrace the street widening program within the area bounded by Royal Street, Conti Street, Joachim Street, Monroe Street, Conception Street and Church Street, and shall include such underpasses and overpasses as may be deemed necessary by the commission, the necessary approaches thereto, and the construction of pump rooms.

"(e) The term 'Parkway Improvements' shall embrace the widening and repaving of Conception Street south of Government Street to the L. & N. tracks at Virginia Street and the construction of a new four lane highway paralleling the L. & N. tracks to Hurtel Street and the continuation of such highway along Hurtel Street to the general vicinity of Stewart Street and from there to U. S. Highway No. 90, the reconstruction of Spring Hill Avenue and the widening thereof within the city limits, the widening of St. Stephens Road to four lanes within the city limits, the improvement of Broad Street between Government Street and Spring Hill Avenue, the improvement and reconstruction of Dauphin Street from the city limits to Conception Street, the improvement of Conception Street from such intersection to the Plaza Enlargement, the construction of facilities for the channelization of traffic at the intersection of St. Stephens Road and Spring Hill Avenue, the construction of a traffic circle at the intersection of Spring Hill Avenue and Broad Street and the improvement of Government Street to Michigan Avenue, and may include the construction, reconstruction and enlargement of ferry slips, and the improvement and reconditioning of ferryboats if deemed necessary by the commission for the adequate operation of the ferries."

With respect to ferries, the bill also alleges:

"(8) That the plants and facilities located on Pinto Island are being operated by the Alabama Dry Docks and Shipbuilding Company, the United States Maritime Commission, and the United States Navy for the construction and repair of vessels and for the construction and operation of facilities in connection therewith to the fullest extent of their capacity, and such operations and the facts hereinabove recited have required the Alabama Dry Docks and Shipbuilding Company to continue ferry service across the Mobile River for the ferrying of its employees from the city to its plant on Pinto Island.

"(9) That the city and the United States Maritime Commission have entered into a contract for the purpose of establishing passenger ferry service to carry passengers between the city and Pinto Island and in connection therewith the city has agreed to furnish and operate a passenger ferryboat or passenger ferryboats for the use of officers, employees, invitees and licensees, of the United States Maritime Commission, the United States Navy, Doullut & Ewin, the Alabama Dry Dock and Shipbuilding Company, and the public generally (the boat or boats and the facilities and appurtenances relating thereto being hereinafter sometimes collectively called the 'ferries') ; and that a true copy of said contract between the city and the United States Maritime Commission is hereto attached and marked 'Exhibit A' and made a part of this petition as fully and completely as if here set out in full.

"(10) That, pursuant to the said contract, the city has acquired two ferryboats, and to pay the entire purchase price of one of them and a part of the purchase price of the other moneys have been temporarily advanced from the general fund of the city, and the amounts so advanced are to be reimbursed to the general fund from the revenues of the ferries, and the balance of such purchase price of one ferryboat is payable from the revenues of the ferries, all without incurring any indebtedness of the city for such purpose."

Tolls and charges for the use of the tunnel are by the resolution at all times to be sufficient to provide funds for the bond requirements, and shall be collected by the city commission and deposited daily with a depository for certain operating expenses, and the balance pledged to the payment of the principal and interest of the new bonds, which are not the general obligation of the city. Certain surplus revenues from the operation of the ferries are also pledged for the security of the principal and interest of the new bonds.

The bill also alleges that the Plaza Enlargement and Parkway Improvements and ferries, above mentioned, are now imperatively required and constitute an integral part of the original tunnel project.

The prayer of the bill seeks to have the decree also validate and confirm the contract between the city and the United States Maritime Commission relating to the operation of the ferries, and the service there to be rendered, and the pledge to the tunnel sinking fund of the surplus revenues of the ferries as provided in the resolution. Section 604, page 26 of the printed resolution (page 44 of record) makes provision for a "Ferry Revenue Fund" to include gross revenue from the operation of the ferries. That is to be applied to operating expenses of the ferries, to pay installments of the purchase price of ferry boats and equipment, and to reimburse the city's general fund for moneys advanced in that connection and on the 10th of each month the balance remaining in that fund on the last day of the preceding month after certain deductions are made, shall be transferred to the credit of the Mobile Tunnel Sinking Fund.

We do not find where the proceeds of the new bonds are to be used in connection with the ferries or to pay any amounts for the acquisition or use except as described in the "Parkway Improvements," supra.

The authority of the city to acquire and operate the facilities described is rested on sections 341 to 352, Title 37, Code of 1940. So also the authority to issue revenue anticipation bonds without an election and without creating a city debt is rested on the same statutes.

It is not contended that the city can by this resolution and project create a general obligation of the city, having special reference to section 225, Constitution of Alabama.

The city acquired by its own construction the tunnel as it now appears, under authority of those statutes, and issued revenue anticipation bonds, pledging the revenue to be derived from its use. The proposal now is to enlarge and extend its usefulness by making the improvements and extensions which we have described, so that the revenue from its use will be pledged for the enlarged amount of bonds

667

including that of those now outstanding, upon their redemption.

The maps show that the tunnel connects with Highway No. 90 at Blakely Island, near Pinto Island—the location of the shipbuilding operations. The city is operating a ferry service across the river near the tunnel from the city to Pinto Island. The workers use both facilities. The ferry supplements the tunnel use in that respect.

The contention is that the proposed improvements, including those of the ferry service, constitute a betterment or extension of the tunnel project, and that section 342, Code, supra, provides for the pledge of tolls from the use of the tunnel to finance betterments and extensions to any such undertaking. That to do so there is no limitation as to what portion of such tolls shall be pledged. Those of the undertaking as it stands before the extensions are to be so used as well as those from the entire project as extended, subject to certain priorities upon tolls from the ferry service.

The first question in that connection is whether the pledge of tolls from the undertaking as now constructed creates a debt of the city as contemplated in section 225, Constitution.

The contention of appellant is that it does have that effect on the principles declared by this Court in Re Opinions of the Justices, 226 Ala. 570, 148 So. 111, 113; Town of Opp v. Donaldson, 230 Ala. 689, 163 So. 332; Oppenheim v. City of Florence, 229 Ala. 50, 155 So. 859; Fuller v. City of Cullman, 240 Ala. 309, 199 So. 2.

But our view is that this situation is not controlled by those cases. The status which creates a city debt by pledging revenue from its property then owned, contemplates such revenue as the city would own free of restraint but for the pledge of it. When the city is buying or constructing a new undertaking, a pledge of the anticipated revenue from it to pay the cost of its acquisition takes nothing which the city has at that time acquired, or is then or has ever been subject to free use and disposition by it. But if such revenue of the already acquired property is pledged to pay a new debt, although it is used to make extensions to the old property, it freezes funds which have already been potentially acquired, and an obligation to pay with the income of property already owned by a city is not different from an obligation to pay with other funds so far as this question is concerned.

But that principle is limited to such facilities as the city may have acquired or to revenue from facilities which when paid for or fully acquired shall become city property subject to its general purposes. When a waterworks or electric plant or sewerage system is acquired and paid for, the city has income producing property which is not ear-marked. But not so as to income held by it in trust for a specific purpose, and which cannot at any time be used for any other purpose by the city. An enlargement of that purpose and a pledge of such income to that end is a use within the contemplation of the trust.

We will undertake to show that the income here in question is of the latter sort.

It is of course well known that Mobile River is navigable, and its bed is owned by the State. State v. Harrub, 95 Ala. 176, 10 So. 752, 15 L.R.A. 761, 36 Am.St.Rep. 195; Hood v. Murphy, 231 Ala. 408, 165 So. 219.

The city claims authority from the State by a Governor's certificate, dated March 17, 1939.

The only right claimed by the city to charge toll for the use of the tunnel is contained in the Municipal Revenue Bond Act of 1935 (Acts 1935, page 195), now sections 341 to 352, Title 37, Code of 1940. That authorizes a city to construct and operate (section 342) a tunnel as an "undertaking," (section 341) and to prescribe and collect toll charges and to issue revenue anticipation bonds to finance the cost of acquisition or construction and extensions of it and to pledge the revenues so derived to their punctual payment (section 342). And that the amount of toll charges shall be such as will produce revenue at least sufficient to pay when due all bonds, with interest, and expenses of operation and maintenance reserves therefor (section 351).

The Act describes itself as the "Municipal Revenue Bond Act of 1935." The bondholders cannot compel any exercise of the taxing power of the city, nor the payment of their bonds from funds other than the revenue of the undertaking. § 349, Code; § 10, Act of 1935, supra. No provision is made for any toll charges in excess of such amount as is necessary to pay the bonds and expenses of operation, unless the words "at least" carry such

668

authority. We do not think they do for the reasons which we will state.

There is no provision made for any use or disposition of revenue collected from toll charges in excess of the amount necessary to pay for cost of acquisition, the bond requirements and expenses of operation including maintenance and reserves therefor. § 351, supra. There is nothing to indicate that any portion of such revenue can ever reach the general fund of the city. And it also appears as a fair inference that when all such requirements are taken care of, no toll charges shall be further collected, except for maintenance and operation.

It is apparent that section 24, Constitution 1901, does not permit of any implied power of the city to make toll charges in this respect. Such claim of right must be not only expressed, but any such authority must be strictly construed. McDonnell v. Murnan Shipbuilding Corp., 210 Ala. 611, 98 So. 887. The only express power granted by the Revenue Bond Act, supra, is to pay the cost of acquisition, construction or extension, bond requirements, expenses of operation, maintenance and "reserves therefor." This is set out fully in sections 342, 351, Title 37, Code of 1940.

The city is made virtually a trustee of the fund derived from the toll charges, and can use that fund only for the purpose thus prescribed. Among those purposes there is included not only the cost of acquisition, but also of "reconstruction, improvement, betterment or extension of any undertaking," and to pledge the revenues derived from it for that purpose, whether those revenues are from the original facility or as it may be so improved or extended.

The facility does not become the property of the city in the same sense as a waterworks or electric light plant, for it can be used only for street purposes. The city has a duty to maintain its streets fixed by law. Ex parte Whaley, 188 Ala. 381, 66 So. 145; City of Bessemer v. Whaley, 187 Ala. 525, 65 So. 542; Grambs v. City of Birmingham, 202 Ala. 490, 491, 80 So. 874.

But the legislature of the State has plenary power over the streets of a city, except as limited by the Constitution. Wiggins v. Skeggs, 171 Ala. 492(4), 54 So. 756; City of Birmingham v. Hood-McPherson Realty Co., 233 Ala. 352(2), 172

So. 114, 108 A.L.R. 1140; Ryan v. Goodrich & Crinkley, 199 Ala. 642, 75 So. 17; City Council of Montgomery v. Parker, 114 Ala. 118, 126, 21 So. 452, 62 Am.St.Rep. 95; Perry v. New Orleans, M. & C. R. Co., 55 Ala. 413, 28 Am.Rep. 740; Duy v. Alabama West. Rwy. Co., 175 Ala. 162(5), 57 So. 724, Ann.Cas. 1914C, 1119; Southern Railway Co. v. Ables, 153 Ala. 523, 45 So. 234; 15 Ala. Dig., Municipal Corporations, ☞661(1), p. 171.

This rule applies to a tunnel which is an extension of the state highway system. New Jersey Interstate Bridge & T. Comm. v. Jersey City, 93 N.J. Eq. 550, 118 A. 264.

The city acquired nothing by this tunnel which is not subject to State legislation, subject to constitutional rights. New Jersey Interstate Bridge & T. Comm. v. Jersey City, supra.

Except as it may affect the rights of bondholders outstanding, and existing by authority of legislative enactment, the legislature can control the amount and disposition of toll charges for the use of this tunnel or cut them out entirely. They are not income from property owned by the city, which it has the power to use in its discretion as the law is now set up. Whether the legislature could authorize its use for general revenue purposes of the city after the cost of acquisition is fully paid for, we need not now inquire. It is sufficient to observe that in our opinion it has not been here so expressed or intended.

It is clear to us that a use of such revenue under existing law to construct improvements and extensions or betterments to the tunnel, and its facilities, or to pledge them for money borrowed for that purpose by using revenue anticipation bonds does not create a city debt under section 225, Constitution.

The next feature of the problem before us is whether such proposed improvements can be so classified in all its parts as to constitute an extension of the tunnel project.

The evidence shows that the tunnel was fully completed as originally planned. The urgent necessity for the improvements to the streets leading to the entrance, and the approaches now sought to be constructed, has been brought about by an increase in traffic, due largely to war activity, not contemplated when it was planned and built.

This increased traffic is shown to create a "jam" which the evidence shows will be relieved by this new work. The tube proper is sufficient to take care of this condition. At the time of its construction it was considered by the engineer to be of vital importance to have the approaches and plaza improvements, but funds were not then available, so that they were not included in the project as then planned. No estimate was then made, however, of anything like as much traffic as is now using the tunnel, nor were the improvements now proposed worked out as a part of the engineering scheme. We take the following extracts from the evidence as illustrative of its tendency:

"It is our opinion that the fundamental reason of the growth is the general increase in importance of the Gulf Coast Area. We sensed the tremendous possibilities of this area in 1938 when we decided to open an office in this area. This tunnel is the only passage east and west for approximately seventy-five miles, and north of Mobile there is an impenetrable swamp that will cause the east and west traffic to tunnel at Mobile in both directions. We cannot see any competitive passageway, because of prohibitive cost of coming through this delta area. This war has made the increase go over the sound estimates. We believe that we have taken this surplus off and have not taken it into consideration in the continued financing of the tunnel. * * *

"Serious traffic problems; blocking of streets at times; the fire trucks have had to back up and take other routes; the breaking up of the streets themselves physically. There has been great congestion coming through the tunnel at the change of shifts of the workers at the shipyards, requiring forty-five to fifty-five minutes to get through the tunnel and we believe generally this hampers the shipbuilding projects and constitutes one of the marked causes of discontent of shipyard workers, causing the recent strike. * * *

"The basic reason that the city acquired these ferries is because of the difficulties in the existing bond resolutions, which state that the city must use every legal effort to protect the franchise of the tunnel. We found that it was absolutely necessary because of congestion in the tunnel to give this additional service, until there could be provided free access to and from the tunnel.

When the city took exception to private operators going into the business in competition with the tunnel, it found that the only way it could protect itself was to go into the ferry business itself. It became an obviously necessary service essential, and the city of Mobile was the proper entity to provide it. * * *

"It is the city's intention, as expressed in conversation with me, that the ferries will only operate as long as is absolutely necessary.

"Mr. Palmer, from your knowledge of the conditions of the operations in the tunnel and from the necessity of transporting war workers to and from Pinto Island, is it, in your opinion, necessary to acquire and operate, as a part of the tunnel project, these ferries? (Ans.) Yes. * * *

"The arrangement made in regard to the ferries: has it been done at the request of the Navy and the Maritime Commission? (Ans.) At the request of the Maritime Commission.

"These ferries that are being operated are being paid for entirely out of the revenue derived from their operation, are they not? (Ans.) Yes, sir. * * *

"Daily, monthly and annually. Perhaps the clearest conception of that is this chart showing the number weekly. It starts on the day before Pearl Harbor and shows 18,979 cars. Under a normal operation there would be a hollow in this graph each spring and fall. Now you will notice there is almost a constant build up in traffic until the 8th day of August, when it reached 44,895. Then in a period of three and a half months, by the 21st day of November, it had reached 48,494, or approximately 7,000 a day. 1,032 cars a day for this year was our original estimate. * * *

"And it is necessary in order to make that tube or tunnel operate to its capacity that these tunnel improvements outlined should be made, to relieve the congestion that has resulted? (Ans.) Yes, sir. * * *

"How do you propose to correct these difficulties?

"We are recommending to the city that construction of certain underpasses, and certain street widening in that immediate vicinity, and possibly at one point an overpass and a general removal of all traffic lights from that area, so traffic will be flowing in constant motion at all times, and never have to be stopped by cross traffic or traffic lights.

"On Government Street we recommend the removal of the rails and paving with modern pavement, out to Michigan Avenue, where the road will tie in with the road to Brookley Field. Then take the rails out of Dauphin Street and do some widening and pave Dauphin through to the city limits. Dauphin is not a main trunk street but is an important local feeder. Then the removal of the rails from Springhill Avenue, correcting the situation at Broad and Springhill Avenue and at Five Points, and narrowing down on the grass plots, widening the driving space on both sides of Springhill Avenue to the city limits. Then develop four lanes in place of the two lanes of traffic on St. Stephens Road, by widening or using separate lanes for each track. Widen Conception Street from Government to Canal to a four lane street, repaving the existing street to Virginia and go parallel to the L. & N. tracks as far as Hurtel, paving Hurtel as far as Stewart, then angle off in a general westwardly direction to tie in with United States Highway 90. Construct by-passes all along Conception Street, thereby providing a high speed four lane highway, restricting the grade intersections to a minimum, thereby providing a competitive highway to any possible highway around the north of the city that might be contemplated, and will inevitably be constructed in the future, if this improvement is not made. This will take the heavy traffic off the side streets and will be a distinct business getter for the tunnel.

"Will it relieve the traffic congestion resulting from the operation of the tunnel and result in capacity functioning of the highway? (Ans.) It will completely relieve and allow the tunnel to operate to capacity, that is forty-five cars an hour. * * *(405 cars an hour?)

"At the time of change of shifts in the afternoons and the time of going to work in the morning, you will find as many as six lanes of traffic trying to get in the tunnel, and many of the shipyard workers will go to the north and drive around to avoid this congestion. * * *"

This was the undisputed testimony on the trial of the case. It thus appears that the "Plaza Enlargement" and "Parkway Improvements," as described in truth and fact, constitute an extension of the tunnel facilities and are proper appurtenances to it. We think it would be too narrow a construction of the law to confine the term "tunnel" as an undertaking, mentioned in section 341, Code, supra, to the tube itself. The statute includes "appurtenances," "approaches" and "connections." Just what should be so considered as a part of the undertaking is dependent upon many factors, largely influenced by factual conditions which probably have no exact counterpart elsewhere. Much technical knowledge is also useful in solving this feature of the problem, together with experience in that connection, including a personal view of the situation and conditions. It seems to be customary elsewhere to include in such a project quite extended approaches. The facts do not justify a conclusion that the proposal is a covinous scheme to divert the revenue from this facility to pay for extraneous improvements.

### As to the Ferries.

Section 341, Code, supra, defines as an undertaking, "causeways, tunnels, viaducts, bridges and other crossings," and also that one undertaking may include "any combination of two or more of such undertakings, whether now existing or hereafter acquired or constructed." The two may thereby be combined into one. But we do not think this should be so interpreted as to authorize a combination of undertakings which do not serve a common purpose, and are not very closely related in location and in kind, but think that each feature of the combination should be an important factor in the service rendered by the other.

The evidence which we have recited shows the close relationship between the tunnel and ferries, both in the nature of service rendered, each as an aid to the other, and their close physical location to each other.

The ferry boats have already been acquired, and are to be paid for solely out of the revenues to be derived from their operation. The proceeds of the bond issue are to be used exclusively in redeeming the bonds outstanding, originally issued to construct the tunnel, and to finance the cost of constructing the "Plaza Enlargement" and the "Parkway Improvements," as defined in the bond resolution copied in this opinion.

The ferries were supposed to be authorized as an "other crossing" of the river within the terms of section 341, Code, supra.

There is no reason urged as to why we should disagree with that contention or with the contention that the surplus revenue derived from their use may be pledged to secure this proposed bond issue upon a combination of the ferry service with the tunnel project. The validity of the contract between the city and the United States Maritime Commission relating to the operation of the ferries and the service to be rendered thereby is only incidentally involved in the power of this Court, by virtue of section 170, Title 7, Code of 1940, under which this proceeding is conducted, to determine the authority of the city "to issue such obligations [meaning bonds, as here applied], and the legality of all proceedings had or taken in connection therewith * * * and the validity of all pledges of revenues and of all covenants and provisions contained in any such * * * resolution." But since that contract is alleged to be an important factor in determining the value of the proposed securities now to be issued and is embraced in the covenants of the city contained in the bond resolution, it shall rightly be held to be within the contemplation of that statute in connection with section 345, Title 37, Code of 1940.

Proceeding therefore to consider it, we think that in the absence of any specific claim of invalidity made by the appellant, a ferry system may properly be treated as an "other crossing" of the river, set in the same phrase with "causeways, tunnels, viaducts, (and) bridges." It is of the same general class. 59 Corpus Juris 981; Bank of Savings & Trusts v. United States Casualty Co., 242 Ala. 161, 5 So.2d 618.

And it is so intimately related to the tunnel here in question as to be not improperly combined with it, so that it would not be a diversion of the revenue so derived to pledge a surplus of it in combination with revenue from the tunnel itself to secure the bonds here under consideration.

Since no claim is made as to the invalidity of the contract with the Maritime Commission, we will not undertake to find fault with it, but approve it as a feature of the covenants of the city in the bond resolution.

We are also called upon to determine the validity of the other covenants of the city contained in the bond resolution. This is authorized by section 170, Code, supra. Likewise as to them, we have not been cited by appellant to any feature which is not authorized by law. On the other hand, they seem to be specially authorized by section 345, Code, supra, which is a feature of the Revenue Improvement Bond Act, now under consideration. We need not treat the covenants in detail.

We find no occasion to disagree with the decree of the circuit court confirming the proposed bond issue, and its several specific features. It is therefore affirmed.

Affirmed.

All the Justices concur.