909 So.2d 783 (2005)
Fred EAGERTON
v.
SECOND ECONOMIC DEVELOPMENT COOPERATIVE DISTRICT OF LOWNDES COUNTY, a public corporation; et al.
1030667.
Supreme Court of Alabama.
March 4, 2005.
*785 J. Doyle Fuller and Susan G. Copeland of Law Office of J. Doyle Fuller, P.C., Montgomery, for appellant.
E. Alston Ray and Thomas E. Walker of Johnston Barton Proctor & Powell, LLP, Birmingham, for appellees.
Kenneth Smith, chief counsel, Montgomery, for amicus curiae Alabama League of Municipalities, in support of the appellees.
Mary E. Pons, Montgomery, for amicus curiae Association of County Commissions of Alabama, in support of the appellees.
J. Foster Clark and Ed R. Haden of Balch & Bingham, LLP, Birmingham; and John G. Harrell and W. Stanley Gregory of Bradley Arant Rose & White, LLP, Montgomery, for amicus curiae J. Foster Clark.
HARWOOD, Justice.
Fred Eagerton appeals from an order entered by the Lowndes Circuit Court validating the issuance and sale of bonds for the purpose of financing an industrial manufacturing facility in Lowndes County. We reverse and remand.

Facts and Procedural History
In January 2003, Daehan Solution Alabama, L.L.C. ("Daehan"), announced that it would build a plant in a 168-acre industrial park in Lowndes County. Daehan had chosen to locate in Lowndes County because of financial incentives offered by the County. In October 2003, three applicants applied to the Lowndes County Commission ("the Commission") and the Second Economic Industrial Development Authority of Lowndes County ("the IDA") for the authority to incorporate the Second Economic Development Cooperative District of Lowndes County ("the District") as a capital improvement cooperative district, a public corporation organized under Ala. Code 1975, § 11-99B-1 et seq.[1]
*786 On October 15, 2003, the Commission held a meeting at which it adopted a resolution purporting to authorize the application to incorporate the District. On that same day, the IDA adopted an authorizing resolution containing language identical to the language in the resolution adopted by the Commission. Following the adoption by the Commission and the IDA of both resolutions, and in compliance with Ala. Code 1975, § 11-99B-4, the applicants filed a certificate of incorporation in the office of the judge of probate in Lowndes County.
During the incorporation process, the District entered into a funding agreement with Lowndes County. In the funding agreement, the District proposed to borrow up to $10 million to finance Daehan's locating its plant in the County and to issue revenue bonds to evidence that debt. In order to assist the District in paying off both the principal and interest of the bonds, the funding agreement required the County to "budget and appropriate and pay over to the District in each fiscal year an amount equal to certain County ad valorem taxes and certain County sales and use taxes received by ... the County in such fiscal year." Specifically, the County agreed to budget and appropriate payments from the income from five existing sources, referred to in the funding agreement collectively as "County Tax Revenues."
The first source is a three-mill ad valorem tax levied by the County pursuant to Act No. 2002-327, Ala. Acts 2002, on each dollar of taxable property, to be paid "to the county general fund to be used for county general fund purposes." The second source is the noneducational ad valorem taxes payable to the County from the property on which the industrial park is located. The third source is an amount derived from one mill of the ad valorem taxes payable to the County pursuant to § 215, Ala. Const. 1901. The fourth source of revenue consists of two one-cent privilege license taxes against gross sales or gross receipts, levied pursuant to Act No. 2003-143, Ala. Acts 2003, and Act No. 97-551, Ala. Acts 1997, respectively. These taxes are specifically directed to be deposited into the Lowndes County General Fund, and Act No. 2003-143 specifically directs that the funds be used "for general county purposes." The fifth and final source of revenue is described in the funding agreement as "for the fiscal year ending September 30, 2004, the sum of $100,000 out of the payment in lieu of taxes made by General Electric to the County."
Section two of the funding agreement states:
"Anything contained herein notwithstanding, the covenant of the County to so budget and appropriate shall not constitute a general indebtedness of the County and shall be payable solely from County Tax Revenues in each fiscal year of the County. The general faith and credit of the County are not pledged for payment of the principal of and interest on the Revenue Bonds, and the Revenue Bonds shall not be general obligations of the County."
Section three of the funding agreement sets out the County's obligations concerning the County Tax Revenues:
"In order to facilitate the collection and application of the County Tax Revenues to the payment of and the interest on the Revenue Bonds, the County will deposit with the [sic] a commercial bank having an office located in Lowndes County, Alabama that will act as depository *787 of the County Tax Revenues (such bank, acting in such capacity as a depository being herein called the `Current Fiscal Year Depository'), daily as received by it, all County Tax Revenues.
"Not later than January 25 and July 25 in each year [preceding] the February 1 and August 1 interest and principal payment dates with respect to the Revenue Bonds, the Current Fiscal Year Depository shall transfer the balance held in the depository account created for such purpose to the Trustee, and an amount equal to any County Tax Revenues received by the Current Fiscal Year Depository between such January 25 or July 25, as applicable, and the following debt service payment date with respect to the Revenue Bonds, shall be paid by the Current Fiscal Year Depository to the Trustee on such debt service payment date or the next business day of the Trustee following such debt service payment date."
Section four of the funding agreement provides that the County's obligations under the funding agreement "shall continue for so long as any `Indenture Indebtedness,' as defined in the Indenture, shall remain outstanding." The trust indenture entered into between the District and J.P. Morgan Trust Company, N.A., which serves as the trustee under the indenture, defines "Indenture Indebtedness" as "all indebtedness of the District at the time secured by the Indenture, including" principal, interest, and any premium on the bonds, plus any fees for services performed and disbursements made.
Section five of the funding agreement lists the various events that constitute an "event of default" under the funding agreement. Those events include 1) the County's failure to deposit "any" of the County Tax Revenues or to make any other required payment when such payment becomes due and payable; 2) the County's failure to budget and appropriate the County Tax Revenues each year; and 3) the County's failure to abide by any other provision of the funding agreement for a period of 30 days after being notified of such failure. Upon the occurrence of an event of default the District is allowed several remedies, including the ability to
"take whatever other actions at law or in equity ... to collect the payments then due or to enforce any obligation, covenant or agreement of the County under this Agreement; provided, however, that under no circumstances [would] the District... be entitled to the payment of any moneys hereunder other than County Tax Revenues received by ... the County in the then current fiscal year of the County."
After filing the certificate of incorporation and executing the funding agreement, the board of directors of the District, along with the County and members of the Commission (collectively referred to as "the appellees"), pursuant to Ala.Code 1975, § 11-81-221, filed a complaint against the taxpayers and citizens of Lowndes County seeking to validate the revenue bonds the District proposed to issue to finance the Daehan plant. In response, Fred Eagerton, a taxpayer and citizen of the County, on behalf of the taxpayers and citizens of the County, filed a motion to dismiss the bond-validation action. He later filed an answer to the complaint and a counterclaim, which was subsequently amended. The amended counterclaim alleged that neither the resolution adopted by the Commission nor the resolution adopted by the IDA authorized the District's incorporation.
Upon close examination, the Commission and the IDA discovered that the authorizing resolution each adopted on October 15 did not contain certain findings necessary *788 to comply with Ala.Code 1975, § 11-99B-3(b). Specifically, the resolutions failed to declare that it was "wise, expedient, and necessary that the proposed district be formed" and failed to authorize either the Commission or the IDA "to proceed to form the proposed district by the filing for record of a certificate of incorporation." The Commission and the IDA each adopted an amended resolution on December 8, 2003, to add this finding and the authorization to incorporate the District. Additionally, the Commission and the IDA each amended the minutes of its meeting of October 15 to reflect that the authorizing resolutions had been so amended.
On January 16, 2004, the Lowndes Circuit Court entered an order validating the revenue bonds the District sought to issue. Eagerton appealed from that order.

Standard of Review
Because the trial court heard "live" testimony at the hearing it conducted in this case, we review its findings of fact under the ore tenus standard of review. "`Under the ore tenus rule, a trial court's findings of fact are presumed correct and its judgment will be reversed only if plainly or palpably wrong or against the preponderance of the evidence.'" Ex parte Baron Servs., Inc., 874 So.2d 545, 548 (Ala.2003) (quoting Ex parte Cater, 772 So.2d 1117, 1119 (Ala.2000)). "[T]he ore tenus rule does not extend to cloak a trial judge's conclusions of law ... with a presumption of correctness." Baron, 874 So.2d at 549 (quoting Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999)). Therefore, we review all legal issues in this appeal de novo. Brown v. Board of Educ. of Montgomery County, 863 So.2d 73, 75 (Ala.2003).

Analysis
Eagerton raises 10 separate grounds that he contends require this Court to reverse the judgment of the Lowndes Circuit Court validating the bonds. Because on the basis of one of these grounds we conclude that the Lowndes Circuit Court erred to reversal, we address only that ground and one other, involving a jurisdictional question.

A. Subject-Matter Jurisdiction
Eagerton's first ground for reversal is that the Lowndes Circuit Court lacked subject-matter jurisdiction over the bond-validation proceeding. Although Ala.Code 1975, § 11-99B-3, requires both the Commission and the IDA to adopt resolutions authorizing the incorporation of the District, Eagerton focuses only on the Commission's resolution, arguing that it was insufficient to authorize the incorporation of the District. Because the resolution failed to authorize the incorporation, Eagerton contends, the subsequent certificate of incorporation filed by the District was defective. Because its certification of incorporation was defective, he continues, the District failed to attain status as a capital improvement cooperative district; thus it lacked standing to bring a bond-validation action. If a party has no standing, Eagerton argues, a trial court cannot acquire subject-matter jurisdiction over the case or controversy the party attempts to present.
Eagerton is correct that "[w]hen a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction." State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1028 (Ala.1999). Without subject-matter jurisdiction, any judgment entered in the action is void, Sumlin Constr. Co., L.L.C. v. Taylor, 850 So.2d 303 (Ala.2002), and "[a] void judgment will not support an appeal." Moore v. John Hancock Life Ins. Co., 876 So.2d 443, 448 (Ala.2003) (citing Baldwin County v. Bay Minette, *789 854 So.2d 42 (Ala.2003)). Of necessity, then, this Court must determine whether the trial court had subject-matter jurisdiction over this appeal, and, if not, we must dismiss the appeal without ruling on its merits.
Eagerton is also correct that if the District did not exist as a capital improvement cooperative district, it would lack standing to bring the bond-validation action. Specifically, its board of directors would not exist as the "governing body" of a public corporation and would thus be precluded from filing a bond-validation action under Ala.Code 1975, § 11-81-221. Eagerton overlooks the fact, however, that an improperly formed corporation can nevertheless exist as a de facto corporation. "A de facto corporation ... can be brought into being when it can be shown that a bona fide and colorable attempt has been made to create a corporation, even though the efforts at incorporation can be shown to be irregular, informal, or even defective." Harris v. Stephens Wholesale Bldg. Supply Co., 54 Ala.App. 405, 408, 309 So.2d 115, 117 (1975).
We need not reach the question whether a de facto corporation has standing, because the evidence reveals that the District cured the defect contained in its original filing. In the hearing before the trial court in the bond-validation proceeding, the appellees submitted minutes from December 8 meetings of the Commission and the IDA that indicated that the authorizing resolutions and the minutes of their October 15 meetings were amended to reflect what was discussed at the October 15 hearing. The appellees also presented testimony from members of the Commission indicating that the members fully believed that the resolution adopted by the Commission on October 15 and the minutes of the October 15 meeting contained the necessary findings and authorization to incorporate the District.
The appellees cite Town of Cherokee v. Weaver, 414 So.2d 99 (Ala.Civ.App. 1982), in support of their argument that the December 8 amendment corrected any error in the incorporation. Weaver, however, states the rule concerning the amendment of minutes by a municipality; we are concerned in this case with the power of a county. That rule is found in Marengo County v. Barley, 209 Ala. 663, 665, 96 So. 753, 754 (1923), which states that a county commission "has the inherent power to amend its records so as to make them speak the truth" so long as "there be matter of record authorizing the amendment." Here that "matter of record" is the testimony of Commission members that they believed that the necessary findings and authorization, omitted from the resolution and the minutes of the October 15 Commission meeting, were actually included in the resolution. Because this testimony was given in an ore tenus hearing, we must afford a strong presumption of correctness to the trial court's finding that the October 15 minutes and resolutions were effectively amended, and nothing indicates that the trial court's finding is plainly and palpably wrong or that it is against the preponderance of the evidence.
Therefore, we hold that the court did not err in concluding that the appellees presented sufficient evidence indicating that the District had standing to bring the bond-validation action. Consequently, the trial court did not err in concluding that it had subject-matter jurisdiction.

B. Constitutional Debt Limit
Eagerton's second argument is that the funding agreement violates § 224, Ala. Const. 1901, by causing the County to exceed its debt limit. Section 224, as amended by Amendment No. 342, provides, in pertinent part:

*790 "No county shall become indebted in an amount including present indebtedness, greater than five per centum of the assessed value of the property therein...."
The complaint filed by the appellees assessed the value of property in the County at approximately $91 million, placing the County's debt limit at approximately $4.55 million. The revenue bonds proposed to be issued under the funding agreement would represent an obligation of $10 million. Therefore, if the revenue bonds constitute a debt of the County for purposes of § 224, then upon the issuance of the bonds the County would exceed its debt limit, and we must conclude that the funding agreement is unconstitutional.
The intent behind the constitutional provision setting a debt limit for counties is to "curb the improvident creation of debts by counties, and thus protect the taxpayers against excessive and unnecessary burdens." Hagan v. Commissioner's Court of Limestone County, 160 Ala. 544, 551, 49 So. 417, 419 (1909). An underlying purpose, implicit in the stated purpose, is to limit taxation; thus a key question in determining whether an obligation is a debt of a county for purposes of determining the county's debt limitation under § 224 is whether the obligation "directly or indirectly increases the burden of taxation." Taxpayers & Citizens of Georgiana v. Town of Georgiana, 265 Ala. 654, 657, 93 So.2d 493, 496 (1956).
At oral argument conducted January 25, 2005, counsel for the appellees, who acted as bond counsel and who participated in drafting the funding agreement, explained his understanding of the funding agreement as follows: Should the County Tax Revenues received in any fiscal year of the County be insufficient to pay the principal and interest on the revenue bonds coming due in that fiscal year, the obligation of the County under the funding agreement would nevertheless be fully satisfied and the County would have no obligation to fund the deficiency, then or in any subsequent fiscal year. In that regard, counsel for the appellees committed on behalf of his clients that any such "shortfall" occurring in a fiscal year would not carry forward to be satisfied out of the County Tax Revenues received by the County in any subsequent year or years, but would simply be eliminated as a responsibility of the County if it had otherwise fulfilled its contractual obligation to budget and appropriate, and to deposit daily into the "Current Fiscal Year Depository," all County Tax Revenues received during the fiscal year in which the shortfall occurred. Counsel made these assertions despite the provision of section four of the funding agreement that "[t]he obligations of the County hereunder shall continue for so long as any `Indenture Indebtedness,' as defined in the Indenture, shall remain outstanding."
Several attorneys who primarily practice as bond counsel have filed briefs as amici curiae in this case, and they interpret section four differently, asserting that "if any indebtedness remains unpaid at the end of one year, the County's obligations to budget, appropriate, and deposit all [County Tax Revenues] will continue until that deficiency is restored in some future year in which revenues from the [County Tax Revenues] exceed the then-current year's debt service . . . . Any amount of principal or interest remaining unpaid at the end of the year is not extinguished, but remains an obligation owing `until paid.'" (Brief of amicus curiae, J. Foster Clark, pp. 27, 37, adopted and joined by John G. Harrell and W. Stanley Gregory.)
However, because counsel for the appellees has the authority to commit his clients to the construction and meaning he gives the funding agreement, we will accept as *791 binding and enforceable for purposes of this appeal the position to which he has committed his clients. Accordingly, we construe the funding agreement to establish the pertinent obligation of the County solely to budget and appropriate in any given fiscal year all the revenues received during that fiscal year from the County Tax Revenues and to deposit those revenues in the Current Fiscal Year Depository daily as received by the County, and any "shortfall" between the County Tax Revenues so deposited by the County and the debt service on the revenue bonds for the fiscal year in question does not represent an obligation of the County. Under this construction, the County's responsibility with respect to the payment of the revenue bonds will have been fully satisfied and permanently extinguished by virtue of its having fulfilled its responsibilities to budget, appropriate, and deposit as received, in any given fiscal year, all of the County Tax Revenues generated during that fiscal year.
As noted, it is undisputed that five preexisting sources of income constitute the County Tax Revenues. All of the income from those sources constitutes general revenue of the County and is deposited in its general fund.
"`The Constitution has ... made a limitation on the amount of indebtedness which a county (§ 224) or a city (§ 225) may create.
"`This has been construed to apply not only to an obligation to which the county or city pledges its full faith and credit, called a general obligation, but also when the county or city pledges existing property or revenue from existing sources to be derived in the future. The rationale of these decisions is that such an arrangement would freeze funds or property already acquired, actually or potentially, and if a county or city could thus freeze a portion of its income, it might by different transactions freeze it all, and cripple its power to function as a governmental institution to the detriment of taxpayers. In re Opinions of the Justices, 226 Ala. 570, 148 So. 111 [(1933)]; Town of Opp v. Donaldson, 230 Ala. 689, 163 So. 332 [ (1935) ]; Oppenheim v. City of Florence, 229 Ala. 50, 155 So. 859 [(1934)]; Fuller v. City of Cullman, 240 Ala. 309, 199 So. 2 [(1940) ]; Chamberlain v. Board of Commissioners of City of Mobile, 243 Ala. 662, 11 So.2d 724 [ (1943) ]; Wharton v. Knight, 241 Ala. 218, 2 So.2d 310 [(1941) ]; Patterson v. Jefferson County, 238 Ala. 442, 191 So. 681 [ (1939) ]. The full faith and credit of the county or city is not thereby pledged, but a part of it is pledged.
"`Under these authorities and others, however, the county or city does not pledge its faith or credit when the indebtedness incurred to purchase or develop new property or facilities is made repayable solely out of the income to be derived from such property or facilities. We have said that such an obligation by a county or city does not create a debt within the meaning of §§ 224 or 225. Those provisions of the Constitution were intended to limit the burden imposed upon taxpayers by new obligations, and to stabilize the economic position of the institution.'"
Town of Georgiana, 265 Ala. at 656-57, 93 So.2d at 495-96.
In discussing Town of Georgiana in Taxpayers & Citizens of Shelby County v. Acker, 641 So.2d 259, 261-62 (Ala.1994), this Court explained:
"In Town of Georgiana, the governing body of the municipality levied a broad-based gross receipts tax and pledged the proceeds thereof to the payment of the proposed warrant issue. The proceeds *792 would otherwise have been available for general municipal purposes. The pledge of the tax for the payment of the warrants could have indirectly imposed a greater burden on the taxpayer because of the fact that revenues otherwise available for general municipal purposes were being displaced.
"....
"... [T]he warrants proposed to be issued in Town of Georgiana had as their source of payment revenues that otherwise would have been available for general municipal purposes and those warrants would thus constitute a debt in the constitutional sense."
In Edmonson v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966), this Court identified seven characteristics of statutory funding mechanisms it had previously upheld as not creating or incurring a "debt" under the constitutional debt limit. One of those characteristics was that "[e]ach of the statutes appropriated and pledged for the servicing of the bonds, the receipts of a special tax which had not theretofore been paid into the general fund of the State." 279 Ala. at 211, 184 So.2d at 120.
In Opinion of the Justices No. 346, 665 So.2d 1357, 1362-63 (Ala.1995), seven of the nine Justices responding to a request for an advisory opinion joined in an opinion that contained the following statements:
"[C]ritical to the Edmonson [v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966)] holding is the fact that the bonds were to be retired by a new revenue source, one that had not theretofore been payable to the General Fund. In every situation where Edmonson has been applied, every new debt has been paid by new taxes, which did not exist before the issuance of the bonds. In no case have existing funds of the state been permitted to be diverted to pay these new debts.
"House Bill 586 runs afoul of § 213 [which sets a debt limit for State obligations] because it does not create a new revenue source to retire the bonds to be issued by the new public authority but attempts to divert funds that heretofore have been, and, by constitutional provision, must be paid into the General Fund. The fact that the legislature can identify and segregate an existing revenue source does not change the fact that the funds are general funds of the state heretofore available for other state purposes. In order to escape there being a new debt under the Edmonson doctrine, there must be a new source of revenue provided to retire the debt.
". . . This Bill fails the Edmonson test in that it does not establish a new tax or revenue source to be appropriated for the debt service. Instead, H.B. 586 identifies and segregates an existing revenue source and attempts to make existing revenues the source of payment of the bonds, which the constitution does not permit. To escape the strictures of § 213, a new debt must be payable from a new source, such as a special tax."
In the present case no new tax or revenue source is created to help fund the retirement of the bond indebtedness; rather, it bears repeating, the components of the County Tax Revenues are all established and existing revenue sources for the County's general fund.
The appellees argue in their brief that the County "has merely agreed to budget and appropriate certain existing tax revenues" and that this obligation "is only payable from the current year's tax revenues" so that "no ongoing claim exists with respect to tax revenues received and passed for future years" and that the arrangement thus fashioned parallels the structure *793 approved by this Court in Hillard v. City of Mobile, 253 Ala. 676, 47 So.2d 162 (1950), and Opinion of the Justices No. 223, 335 So.2d 376 (Ala.1976).
In Hillard, the City of Mobile had outgrown its existing water-works system and proposed to issue bonds to construct a new system to adequately meet the present and future needs of the city for water; however, the amount necessary to finance the new system would create debt exceeding the limit imposed by § 225, Ala. Const. 1901. Accordingly, it was decided that the Water Works Board of the City of Mobile would construct an adequate system for supplying water to the city, financing the project by the issuance of revenue bonds. The board and the city entered into a contract under which the board committed that for so long as the revenue bonds were outstanding, "the Board agrees to meet the City's requirements for raw water to the extent of 25,000,000 gallons per day and for such water the city agrees to pay at the rate of $288,000 per year, payable in monthly installments of $19,000 ...." 253 Ala. at 680, 47 So.2d at 165. A court challenge was filed, asserting "that a contract calling for future periodical payments creates a debt of the City in violation of sections 222 and 225 of the Constitution of 1901." 253 Ala. at 682, 47 So.2d at 167. On appeal, this Court recognized that "[a] supply of water for the extinguishment of fires and other ordinary public uses is one of the necessities of a city . . . ." 253 Ala. at 681, 47 So.2d at 166. The analysis of the Court, leading to its conclusion that the arrangement under review did not effect a debt for purposes of the city's constitutional debt limit, was as follows:
"In a few states the rule has been adopted that, as soon as such a contract is entered into indebtedness to the amount of the aggregate future payments is deemed to be incurred, irrespective of any condition connected with the furnishing of the water. See, Dillon on Municipal Corporations (5th Ed.) p. 359, section 196. But the same section of that authority also states that:
"`But the weight of authority and, as we think, reason also favor a more liberal construction of the constitutional limitations upon the power to incur indebtedness. Municipal contracts calling for future payments extending over a series of years usually relate to water, light, or some other municipal matter which is regarded as of prime or vital importance to the inhabitants. If the municipality has already reached its constitutional limit of indebtedness, it is obviously debarred from purchasing or establishing a plant of its own, and is forced to contract with some corporation or individual that is willing to incur the large expense necessary in erecting works upon the faith of the city paying annual rentals or other stipulated compensation. A construction, therefore, of these provisions which will debar the city from entering into a contract covering a period of years by making the aggregate amount to be earned and to be paid thereunder immediate indebtedness of the city, would be disastrous to the city's interest; and a city which has already reached the constitutional limit of indebtedness or whose indebtedness closely approaches that limit, would be as effectually debarred from making such a contract as it is from purchasing or contracting for the construction of works of its own. The courts have therefore recognized a distinction between a debt in the sense of the Constitution, and a contract for a future indebtedness to be incurred upon the performance by the contracting party of the agreement out of which a debt *794 may arise. They also recognize a distinction between the latter case and one where an absolute debt is created at once, as by the issue of bonds for the erection of a public improvement, though such debt is payable in the future by installments. In the one case the indebtedness is not considered to be created until the consideration has been furnished; in the other the debt is created at once, the time of payment only being postponed. The courts, therefore, have generally held that contracts by municipalities for a supply of water, light, or other like necessary by which the municipality binds itself for the payment of an annual rental or other periodical consideration for the water or light furnished, do not create indebtedness until the property contracted for has actually been furnished, and the municipality may contract to make such yearly or periodical payments notwithstanding that the aggregate of such payments during the stipulated life of the contract may exceed the amount of the indebtedness limited by the Constitution or by a charter provision. But it has been held that if the city has reached the full limit of its indebtedness, a contract calling for future payments on the property is void under the constitutional provision, if the city has no money in the treasury yielded by current taxation or otherwise to pay for the property either at the time when the contract was made or when the property was delivered and accepted, although there were sufficient funds on hand to pay for it at the time fixed by the contract for payment.'
"We think the foregoing quotation from Dillon on Municipal Corporations is a correct statement of the principles of law which have application here, so far as it goes, but our cases have gone further in its application to provide that each year is a fiscal unit for a county, or city, or even the state, and while such political corporation may anticipate and provide for its necessities for years to come and make present contracts for them, it can only do so, without creating a debt, by making the amount of the same payable each year out of current revenues received for that year; otherwise it constitutes a debt within the meaning of our Constitution.
"In construing the legal status of the present situation, we are content to approve it as not constituting a debt of the City of Mobile by construing it to mean, as we do, that payments for water to be delivered in future fiscal years under said contract are to be made only out of revenues which the City derives during that fiscal year. That legal status was first given effect in this State in the case of Brown v. Gay-Padgett Hardware Co., 188 Ala. 423, 66 So. 161 [ (1914) ]. Since that time we have had numerous occasions to apply the principle. The latest is the Opinion of the Justices [No. 88], 251 Ala. 91, 36 So.2d 475 [ (1948) ]."
253 Ala. at 682-83, 47 So.2d at 167-68.
Brown v. Gay-Padgett Hardware Co., 188 Ala. 423, 66 So. 161 (1914), identified in Hillard as the seminal case on the debt-limitation issue, summarized the principle as being that "a county which is indebted up to the constitutional limit may nevertheless appropriate its anticipated revenues actually assessed for the payment of its ordinary current obligations incurred during and for the year for which such revenues are assessed and payable . . . ." 188 Ala. at 431, 66 So. at 162-63 (emphasis supplied).
In Opinion of the Justices No. 223, this Court was asked to issue an advisory opinion *795 on whether proposed legislation authorizing counties of a certain population and cities situated in those counties "to enter into long-term contracts for the disposal of solid waste, garbage, ashes and rubbish," those contracts to extend "from year to year, but not for more than twenty years," 335 So.2d at 377, and with any costs to the county or city under such contracts to be paid annually out of its general operating funds would run afoul of either § 224 or § 225 of the Constitution. Answering in the negative, this Court reasoned:
"The incurring of a contractual obligation by a city or county under a contract with private individuals for disposal of solid waste for a period of from one year to twenty years is not an indebtedness as defined under Section 224 and 225 of the Alabama Constitution of 1901 provided the annual amount payable under the contract is to be derived from the current revenues received for that year. Hillard v. Mobile, 253 Ala. 676, 47 So.2d 162 (1950); Abrasley v. Jefferson County, 241 Ala. 660, 4 So.2d 153 (1941); Brown v. Gay-Padgett Hardware Co., 188 Ala. 423, 66 So. 161 (1914).
"The proposed bill provides that the cost of a contract entered into under its authority `shall be paid annually out of the general operating funds of the county or city.' This proviso satisfies the requirement that such an obligation will be payable out of current revenues and thus such an obligation will not be considered a debt within the meaning of Sections 224 and 225 of the Alabama Constitution of 1901."
335 So.2d at 380.
The citation in Opinion of the Justices No. 223 to Hillard necessarily acknowledged the more specific exposition in Hillard of the controlling principle  that a local government "may anticipate and provide for its necessities for years to come," 253 Ala. at 683, 47 So.2d at 167, and presently contract for them, without creating a debt, if it restricts the payments for services delivered in a particular fiscal year to the current revenues received for that year.
As aptly summarized by the Supreme Court of Wyoming in Frank v. City of Cody, 572 P.2d 1106, 1114 (Wyo.1977):
"It appears to be a universal rule that an agreement to pay a fixed rate for an important service, such as water, electricity, gas, or other municipal necessaries, over a period of years, upon an as-needed basis, with periodic payment, creates no debt in the sense of the constitutional requirement."
(Citing numerous cases from other jurisdictions, including Hillard.) Thus, the arrangements countenanced in Hillard and Opinion of the Justices No. 223 involved a present contract for the future provision of governmental "necessities" and the obligation to pay for those necessities when and as delivered. Under such an arrangement, the obligation to pay for the service does not accrue each year unless and until the service is delivered; should for any reason the party contracting to deliver the service be unable to do so, the county or municipality contracting to pay for it would have no obligation to pay. That sort of arrangement was clearly conceptualized and differentiated from the arrangement under scrutiny in the present case in that portion of the quotation from 1 John F. Dillon, Commentaries on the Laws of Municipal Corporations § 196 (5th ed. 1911), approved in Hillard, stating:
"`The courts have therefore recognized a distinction between a debt in the sense of the Constitution, and a contract for a future indebtedness to be incurred upon the performance by the contracting party of the agreement out of which a debt may arise. They also recognize a distinction *796 between the latter case and one where an absolute debt is created at once, as by the issue of bonds for the erection of a public improvement, though such debt is payable in the future by installments. In the one case the indebtedness is not considered to be created until the consideration has been furnished; in the other the debt is created at once, the time of payment only being postponed.'"
253 Ala. at 682, 47 So.2d at 167 (quoting Dillon's Commentaries § 196).
Under the funding agreement, the County's obligations are created at once, and there is nothing conditional or contingent about the accrual of those obligations with respect to any future performance; there is no yearly recurring "quid pro quo."
The appellees argue in their brief to this Court that the County's obligation to budget, appropriate, collect, and daily pay over the County Tax Revenues is the same sort of approach as "has become embodied in numerous public finance statutes such as those for Municipal Public Building Authorities, Code of Alabama 1975, Title 11, Chapter 56; County Public Building Authorities, Code of Alabama 1975, Title 11, Chapter 15; and Public Educational Building Authorities, Code of Alabama 1975, Title 16, Chapter 18." Although each of those chapters contain numerous sections as to which we will not undertake a comprehensive overview, in each of those chapters only revenue bonds and revenue warrants are authorized; in each instance the bonds and warrants are "payable solely out of the revenues derived from" the project or operation in question (§ 11-15-9; § 11-56-10; and § 16-18-7(8)); and each chapter authorizes the leasing of projects or improvements "for a term not longer than the then current fiscal year" of the lessee, with a grant to the lessee "of successive options of renewing the said lease agreement on the terms specified therein for any subsequent fiscal year or years" of the lessee (§ 11-15-8; § 11-56-9; § 16-18-9). Thus, the revenue bonds and warrants issued pursuant to those chapters do not create any independent debt, and all leases involved are mandatorily for only the current fiscal year of the lessee, subject to elective renewals in subsequent fiscal years, on a truly "pay as you go" basis.
When tested under the controlling principles recited above (even assuming that the obligation of the County to budget and appropriate the County Tax Revenues would be completely discharged year-to-year by the remittance to the Current Fiscal Year Depository of the County Tax Revenues collected, with no "carryover" of any shortfall to future years) the contractual arrangement structured by the funding agreement would violate § 224 of the Constitution, as amended by Amendment No. 342, by creating an absolute debt at once, payable over the course of many years out of future collections of existing tax revenues otherwise destined for the County's general fund.
Therefore, we reverse the judgment below and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
SEE, J., concurs specially.
SEE, Justice (concurring specially).
I concur in the main opinion. I write specially because the Court was not required to address, and the main opinion does not address, whether an obligation funded by a new source of revenue, such as a new tax, is for that reason not a debt *797 for purposes of § 224, Ala. Const. 1901, as amended by Amendment No. 342 (limiting the amount of indebtedness a county may incur).
This Court has delineated various factors to be considered in determining whether a financial obligation assumed by the government is considered a debt for purposes of the constitutional debt limitation. See Edmonson v. State Indus. Dev. Auth., 279 Ala. 206, 184 So.2d 115 (Ala.1966)(listing seven factors to consider in determining whether an obligation was a debt for purposes of § 213, Ala. Const. 1901, limiting the creation of new debt by the State).[2] In reviewing constitutional limitations on indebtedness, this Court has been mindful that the purpose of the constitutional limitation on government indebtedness is to "protect the taxpayers against excessive and unnecessary burdens." Taxpayers & Citizens of Shelby County v. Acker, 641 So.2d 259, 261 (Ala. 1994). This Court has also been mindful that the "substance rather than mere form" of the indebtedness matters. Id. (stating that "[w]hile courts must be careful to see that the indebtedness limitation is strictly observed, they should remember that the limitation is aimed at actual, rather than theoretical, indebtedness, and they should look to substance rather than mere form").
There is, however, language such as that in Opinion of the Justices No. 346, 665 So.2d 1357, 1362 (Ala.1995), which states that "[i]n order to escape being a new debt under the Edmonson doctrine, there must be a new source of revenue provided to retire the debt," and that in Wharton v. Knight, 241 Ala. 218, 220, 2 So.2d 310, 311 (1941), which states that "obligations payable solely from the proceeds of privilege taxes, duly levied and pledged thereunto, not to become a burden on the general taxpayer, are not inhibited." This language suggests that pledging a new source of revenue to meet an obligation may be sufficient for that obligation to escape classification as debt within the meaning of § 224, Ala. Const. 1901.
Because the Second Economic Development Cooperative District of Lowndes County is using existing sources of funding, not a new revenue stream, to retire the bonds in question, we do not address whether an obligation funded solely by a new source of revenue is for that reason not a debt subject to the constitutional debt limit.
NOTES
[1] Two prior  and flawed  attempts to form such a capital improvement cooperative district resulted in unsuccessful court proceedings to validate bonds proposed to be issued by those districts.
[2] Although Edmonson dealt with the creation of debt by the State under § 213, Ala. Const. 1901, the factors listed in that opinion may guide the courts in determining whether a county incurs a debt for purposes of § 224, Ala. Const. 1901.